STATE OF NORTH CAROLINA v. MICHAEL ALLAN LEWIS

No. COA03-1045

(Filed 2 August 2005)

## 1. Evidence— hearsay—medical diagnosis or treatment exception—videotape interviews of minor children

The trial court did not err in a double taking indecent liberties with a minor case by denying defendant father's motion to suppress and by overruling his objections to the introduction of the interviews of the minor children as substantive evidence on the basis that they were statements made for the purpose of medical diagnosis or treatment pursuant to N.C.G.S. § 8C-1, Rule 803, because: (1) both children testified at trial and were subject to cross-examination, and thus, there was no violation of defendant's right to confrontation; (2) both children were old enough to understand the interviews had a medical purpose and they indicated as such; (3) the circumstances surrounding the interviews created an atmosphere of medical significance; (4) the interviews took place at a medical center with a registered nurse immediately prior to a physical examination; (5) although the examinations took place in a child-friendly room instead of a medical examination room, our Supreme Court has stated that the trial court should consider all objective circumstances of record surrounding declarant's statements in determining whether he or she possessed the requisite intent under Rule 803(4); (6) the evidence taken in its entirety indicates the statements were made at the children's first visit to a doctor after discovery of these particular allegations of sexual abuse; and (7) both children identified their father as the abuser in their interviews, and such identification was not made simply for trial preparation but also to diagnose psychological problems and prepare a course of treatment.

## 2. Jury— alleged juror misconduct—foreperson waited to mark verdict sheet—motion for mistrial

The trial court did not err in a double taking indecent liberties with a minor case by failing to declare a mistrial due to alleged jury misconduct arising out of the foreperson having not yet marked the verdict forms on 22 May when it appears from the transcript that the jury may have reached a tentative verdict on one of the charges on 22 May but the jurors indicated to the trial court that they wanted to continue deliberations the next day,

because: (1) the foreperson followed the instructions of the trial court and waited until all members of the jury were satisfied with the verdict before making the verdict final by marking the form; and (2) the foreperson's indication to the trial court on 22 May that the jury had not reached a final verdict was not a calculated lie, as defendant contends, but rather a cautious adherence to instructions.

**3. Indecent Liberties— motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss charges of taking indecent liberties with a minor at the close of the State's evidence and at the close of all evidence, because: (1) although defendant contends the children's accounts contain conflicting details and therefore lack credibility, it is the province of the jury to weigh the credibility of witnesses; and (2) although defendant presented evidence to contradict the testimony of the children, such discrepancies must be resolved in favor of the State upon a motion to dismiss.

**4. Sentencing— aggravating factors—took advantage of a position of trust or confidence to commit indecent liberties— *Blakely* error**

Defendant's motion for appropriate relief is allowed and defendant is entitled to a new sentencing hearing because a jury did not find beyond a reasonable doubt that defendant took advantage of a position of trust or confidence to commit indecent liberties in order for defendant to be sentenced in the aggravated range. Such error is structural error that is reversible per se.

Appeal by defendant from judgment entered 23 May 2002 by Judge W. Erwin Spainhour in Cabarrus County Superior Court. Heard in the Court of Appeals 20 September 2004.

*Attorney General Roy Cooper, by Assistant Attorney General Clinton C. Hicks, for the State.*

*James P. Hill, Jr. for defendant-appellant.*

MARTIN, Chief Judge.

Defendant was found guilty by a jury of two counts of taking indecent liberties with a minor child. The trial court found as a factor in aggravation of sentencing that defendant "took advantage of a

position of trust or confidence to commit the offense." Defendant was sentenced in the aggravated range to two consecutive terms of twenty to twenty-four months imprisonment. Defendant appeals.

The evidence at trial tended to show the following: C.L., a nine-year-old child, lived with her mother; the defendant, who is her father; and her seven-year-old brother, M.L., in Concord, North Carolina. C.L. testified that one night in January or February of 2001 while her mother was at work, defendant showed her and M.L. porno-graphic movies, pornographic magazines, and pornographic images on his computer. Defendant and M.L. took their clothes off, and they asked C.L. to take off her clothes as well. She complied. M.L., within the hearing of defendant, asked C.L. if she would show him "how [her] private opens." Defendant did not comment on M.L.'s request.

The following night, when her mother left for work, C.L. testified that, "[h]e showed us more sexual movies, and he showed us more things on the computer, and he [brought] out the toys then." The toys, C.L. testified, were "[o]f a man's private and a woman's private," and defendant asked C.L. "to stick the man's private into [her] private." C.L., however, refused. She testified that then defendant "wanted me to make him come," so he "[t]ook my hand and rub[bed] it up and down his private" using a lubricant. Defendant instructed her to do the same to her brother. C.L. testified that later, defendant "taught [her] about a B.J. where a woman sucks on his private, and I had to do that to . . . [m]y brother." Defendant also asked M.L. and C.L. to have sexual intercourse. Defendant told C.L. not to tell anyone about these incidents or he would go to prison.

M.L. testified at trial that he remembered a time when he, C.L., and defendant were all together in the house unclothed. He testified that he and C.L. were coerced by defendant to "touch each other's pri-vates." Defendant also showed them videos of "[p]eople doing sexual things." M.L. testified he saw defendant cleaning his private in the presence of C.L. He stated that defendant was present when M.L. and C.L. touched each other's privates, and that defendant, after describ-ing what a "B.J." was, told C.L. to give her brother a "B.J." C.L. then performed fellatio on M.L.

Defendant testified that one night in February, C.L. and M.L. asked if they could watch a movie. He said yes, and he believed they had put in one of their Disney movies. He was in a different room on the computer at the time. About twenty minutes later, he heard noises inconsistent with a Disney movie, so he went to see what they were

watching. He discovered they were watching some of his porno-graphic tapes. He continued watching with the children for about a minute, then he took out the tape. After this incident, C.L. and M.L. began asking questions about what they had seen, and defendant tried to answer their questions.

Defendant also testified that he suffers from severe depression and a ruptured disc in his neck. He takes medication for his depres-sion, which' causes him to have difficulty achieving an erection and reduces his interest in sex. He denied having his children (1) touch each other, (2) touch his private, or (3) have intercourse with each other. He also denied ever having been naked around his children.

The week after the alleged incidents occurred, C.L. told her mother and maternal grandmother about the sexual acts she per-formed with her father and brother. They, however, did not im-mediately report the incidents. Her mother, T.L., testified that she discussed the allegations with her husband, and he told her the chil-dren had only seen those acts in the pornographic movie they inad-vertently watched. T.L. testified that when questioned again, C.L. admitted to her she had not seen any sexual acts in person but had only seen them on the video tape. Both defendant and his wife testified that they constantly had to discipline their children for not telling the truth.

The alleged abuse was not reported until June, 2001 when C.L. told her aunt, Veronica Lewis, what had happened. Ms. Lewis, the wife of defendant's brother, contacted the Swain County Department of Social Services (DSS), which notified the Concord Police Department of the allegations. John Cunningham, a child protective services social worker with the Swain County DSS, investigated the case and took statements from C.L. and M.L. which corroborated their testimony at trial.

Defendant testified he had a very bad relationship with Ms. Lewis. Defendant and Ms. Lewis had dated before she married his brother. Defendant described Ms. Lewis as being vindictive towards him and said she had threatened him physically on at least one occasion. Defendant's brother, Anthony Lewis, also testified to the "volatile" relationship between defendant and Veronica Lewis.

On 24 July 2001, C.L. and M.L. were taken to the Children's Advocacy Center at the Northeast Medical Center. The Children's Advocacy Center provides medical diagnoses and treatment to chil-

dren who are alleged victims of physical or sexual abuse. C.L. was interviewed by Donna Hinson Brown, a registered nurse, and M.L. was interviewed by Julie Brafford, also a registered nurse. These interviews took place in a "child-friendly" room, not a medical examination room. The interview rooms often have markers or Playdough for the children to play with. Brafford testified that she was wearing a nurse's uniform during the interview.

C.L. and her mother signed a form prior to the interview which stated,

> I have been told that I am here at Northeast Medical Center for a doctor's checkup and that part of that checkup includes talking to Donna Brown, R.N. I also have been told that Donna Brown, R.N., will share what is talked about with the doctor.

M.L. and his mother signed an identical form which identified Julie Brafford as the registered nurse. Each registered nurse also explained to the children and their mother that she would discuss the interview with a medical doctor who would then perform a physical examination. Brown testified that after her interview with C.L., she "shared with [the doctor] my direct recollection of what we had just discussed in the interview room. . . . [and] show[ed] him some diagrams that she had clarified where she had been touched." Brafford also testified that she spoke with the doctor regarding "everything [M.L.] had disclosed" to her.

Brown testified that during the interview she showed C.L. an anatomical drawing of a female and asked where C.L. had been touched that she did not like. C.L. identified the genital area and her mouth. Brown also showed C.L. an anatomical drawing of a male and asked what parts she had touched or had touched her. C.L. identified the genital area as the part she had touched of her father and brother, and she stated that she did not like this touch. During the interview, C.L. again stated that she, her brother, and her father had all been naked one night. She also stated that (1) her father made her brother put his private into her private, (2) her father showed her how to "stroke" his private part, and (3) her father asked her to give her brother a "B.J.", and she thought her father would "whoop" her if she did not comply.

Julie Brafford testified that during the interview, M.L. was unable to speak certain things out loud. She asked him to write what he could not say, and he wrote "he made us perform sexual acts." M.L.

identified a male's "private place" on a drawing as the genital area, and he drew pictures of his private place and his sister's private place. Upon questioning, M.L. said his father had never touched either him or his sister, but he and his sister were made to touch each other. He also said he and his sister had seen "bad things" on the computer and "bad things" on the television with their father. After the interview, the doctor performed a medical examination of M.L. There were no physical findings from the exam.

Both interviews were video-taped. Prior to trial, defendant moved to suppress "any and all evidence resulting from these statements and video and rule the same inadmissible [at] trial," arguing that they "were not made for the purposes of medical diagnosis or treatment." The trial court denied defendant's motion. The tapes were admitted as substantive evidence at trial and shown to the jury, to which defendant made a general objection.

Defendant argues on appeal that the trial court erred in: (1) denying his motion to suppress, and overruling his objections, allowing the video-tapes of the interviews to be admitted as substantive evidence; (2) failing to declare a mistrial due to jury misconduct; and (3) denying his motions to dismiss the charges against him at the close of the State's evidence and at the close of all the evidence. By Motion for Appropriate Relief filed in this Court, defendant also asserts that his sentence, in the aggravated range, was structural error pursuant to the decision of the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403 (2004). We find no error in defendant's trial but hold he is entitled to a new sentencing hearing.

**[1]** First, defendant assigns error to the trial court's admission of the video-taped interviews as substantive evidence. Defendant argues that these were hearsay statements not otherwise admissible under any exception in the Rules of Evidence. The trial court allowed the jury to consider the tapes as substantive evidence on the basis that they were statements made for the purpose of medical diagnosis or treatment pursuant to North Carolina Rule of Evidence 803, which states,

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(4) Statements for Purposes of Medical Diagnosis or Treatment.—Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source therof insofar as reasonably pertinent to diagnosis or treatment.

N.C. Gen. Stat. § 8C-1, Rule 803(4) (2003). This exception to the hearsay doctrine was created because of a "patient's strong motivation to be truthful" when making statements for the purposes of medical diagnosis or treatment. N.C. Gen. Stat. § 8C-1, Rule 803(4) official commentary (2003). We note initially that because both C.L. and M.L. testified at trial and were subject to cross-examination, there was no violation of defendant's right to confrontation under the Sixth Amendment of the United States Constitution. *Crawford v. Washington*, 541 U.S. 36, 59, 158 L. Ed. 2d 177, 198 n.9 (2004) (stating that "[t]he [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it").

In *State v. Hinnant*, 351 N.C. 277, 523 S.E.2d 663 (2000), the North Carolina Supreme Court created the following two-part inquiry to determine if statements are admissible under Rule 803(4): "(1) whether the declarant's statements were made for purposes of medical diagnosis or treatment; and (2) whether the declarant's statements were reasonably pertinent to diagnosis or treatment." *Id.* at 284, 523 S.E.2d at 667. The first part of the inquiry seeks to determine the child's purpose in making the statement, not the interviewer's purpose in conducting the interview. *Id.* at 289, 523 S.E.2d at 671. In *Hinnant*, the alleged victim of sexual abuse was a four-year-old child. She was interviewed by a clinical psychologist after a doctor had already conducted an initial medical exam. The record did not "disclose that [the psychologist] or anyone else explained to [the child] the medical purpose of the interview." *Id.* at 289-90, 523 S.E.2d at 671. In that case our Supreme Court could not conclude that the child understood the interviews were conducted in order to provide medical diagnosis or treatment. Because "there [was] no affirmative record evidence indicating that [the child's] statements were medically motivated and, therefore, inherently reliable," the Court found that the first part of the inquiry was not met. *Id.* at 290, 523 S.E.2d at 671.

In the present case, C.L. and M.L. were both interviewed by a registered nurse, at least one of whom was wearing a nurse's uniform.

The interviews took place in a medical center immediately prior to an examination by a doctor. At the time of the interviews, C.L. and M.L. were nine and eight years old, respectively. Both children signed forms stating they understood that the registered nurse would share their statements with a medical doctor. Both nurses testified that they also explained to the children their discussions would be shared with a doctor, who would then perform a medical examination.

The facts of the case *sub judice* are distinguishable from the facts in *Hinnant*. Here, the children were old enough to understand the interviews had a medical purpose, and they indicated as such. Also, the circumstances surrounding the interviews created an atmosphere of medical significance; the interviews took place at a medical center, with a registered nurse, immediately prior to a physical examination. Although the interviews took place in a "child-friendly" room, not a medical examination room, our Supreme Court has stated that "the trial court should consider all objective circumstances of record surrounding declarant's statements in determining whether he or she possessed the requisite intent under Rule 803(4)." *Id.* at 288, 523 S.E.2d at 670. The record before us indicates that both C.L. and M.L. had the requisite intent to make their statements for a medical purpose, and we therefore conclude that the first part of the inquiry is met.

Defendant also contends the interviews took place after both children had received an initial medical examination; therefore, under *Hinnant*, the statements do not fall under Rule 803(4). *Hinnant*, 351 N.C. at 289, 523 S.E.2d at 670 (stating that "Rule 803(4) does not include statements to nonphysicians made after the declarant has already received initial medical treatment and diagnosis"). The record before us, however, does not indicate that the children had previously received medical attention due to this particular incident of alleged sexual abuse. M.L. acknowledged during his interview that he had already had a head-to-toe checkup. However, there is no indication as to the reason for that checkup. He may have had a routine physical examination, which would not include an examination into possible sexual abuse. C.L. stated that she had once had her privates checked because "her daddy had done something." However, she does not indicate whether that examination took place after the abuse in question or on some previous occasion. The evidence before us, taken in its entirety, indicates the statements were made at the children's first visit to a doctor after discovery of these particular allegations of sexual abuse.

The second part of the inquiry in *Hinnant* asks "whether the declarant's statements were reasonably pertinent to diagnosis or treatment." *Id.* at 284, 523 S.E.2d at 667. Defendant argues that because the interviews took place at least five months after the alleged abuse, there was little chance that a medical examination would reveal physical injuries. Instead, defendant contends, the purpose of the interviews was to gather evidence with which to prosecute defendant. However, our Supreme Court has said that "the identity of a perpetrator is pertinent to diagnosis in a child sexual abuse case" for two reasons:

> First, a proper diagnosis of a child's psychological problems resulting from sexual abuse or rape will often depend on the identity of the abuser. Second, information that a child sexual abuser is a member of the patient's household is reasonably pertinent to a course of treatment that includes removing the child from the home.

*State v. Aguallo*, 318 N.C. 590, 597, 350 S.E.2d 76, 80 (1986). C.L. and M.L. each identified their father as the abuser in their interviews. Such identification, under *Aguallo*, was not made simply for trial preparation, but also to diagnose psychological problems and prepare a course of medical treatment.

The statements also suggested to the doctor "the nature of the problem, which, in turn, dictated the type of examination . . . performed for diagnostic purposes." *Id.* at 597, 350 S.E.2d at 81. We conclude the present case is sufficiently similar to our Supreme Court's holding in *Aguallo*, and the statements in question were "pertinent to [medical] diagnosis or treatment." *Hinnant*, 351 N.C. at 284, 523 S.E.2d at 667. Therefore, the second part of the inquiry is satisfied, and defendant's argument with respect to the admission of the videotaped statements as substantive evidence is overruled.

[2] Defendant's second argument is that the trial court should have declared a mistrial due to jury misconduct. Defendant claims the jury was "fundamentally flawed" because "the jury foreperson lied to the Trial Court, and the rest of the jury went along with the lie." Upon careful review of the trial transcript, we do not agree with defendant's contention that there was any misconduct or misrepresentation by the jury.

At the end of deliberations on 22 May 2002, the trial court asked the foreperson if the jury had reached a verdict on either of the charges. The foreperson said they had not, adding "[w]e haven't

signed anything," and asked if they could continue deliberations the following morning. The next day, the jury sent a note to the trial court saying it was hung, and the following discourse took place:

> The Court: Yesterday, at the end of the day, you didn't say that you had reached a—perhaps reached a verdict as to one case. In fact, had you reached a verdict as to one of the cases and not signed the verdict sheet?
>
> Foreperson: (Nods head affirmatively.)
>
> The Court: Is that still the case?
>
> Foreperson: No.
>
> The Court: So, at this particular point there is no verdict as to either case?
>
> Foreperson: Exactly.

It appears from the transcript that the jury may have reached a tentative verdict on one of the charges on 22 May. However, the jurors wanted to continue deliberations the next day, as they indicated to the trial court, and the foreperson had not yet marked the verdict sheet. In its charge to the jury before deliberations began, the trial court instructed, "[w]hen you have reached a unanimous verdict, have your foreperson mark the appropriate places on the verdict forms." The foreperson, having not yet marked the verdict forms, did not commit "blatant misconduct" as defendant contends. Instead, the foreperson followed the instructions of the trial court and waited until all members of the jury were satisfied with the verdict before making the verdict final by marking the form. N.C. Gen. Stat. § 15A-1237(a) requires that "[t]he verdict must be in writing [and] signed by the foreman." N.C. Gen. Stat. § 15A-1237(a) (2003). The foreperson's indication to the trial court on 22 May that the jury had not reached a final verdict was not a calculated lie, as defendant argues, but rather a cautious adherence to instructions. This argument is overruled.

[3] Defendant also argues the trial court erred by denying his motions to dismiss the charges against him at the close of the State's evidence and at the close of all the evidence due to the insufficiency of the evidence. In reviewing a motion to dismiss on the grounds of sufficiency of the evidence, the issue is "whether substantial evidence exists as to each essential element of the offense charged and of the defendant being the perpetrator of that offense." *State v. Glover*, 156

N.C. App. 139, 142, 575 S.E.2d 835, 837 (2003). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Vick*, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995). "The trial court must consider the evidence 'in the light most favorable to the State,' and the State is entitled to every reasonable inference to be drawn from it." *State v. Quinn*, 166 N.C. App. 733, 739, 603 S.E.2d 886, 889 (2004) (quoting *State v. Bright*, 301 N.C. 243, 257, 271 S.E.2d 368, 377 (1980)). " 'The evidence offered by the State must be taken to be true and any contradictions and discrepancies therein must be resolved in its favor.' " *State v. Thompson*, 43 N.C. App. 380, 380, 258 S.E.2d 800, 800-01 (1979) (citations omitted). The trial court, in considering a motion to dismiss, may not weigh the credibility of the witnesses. *State v. Holland*, 161 N.C. App. 326, 328, 588 S.E.2d 32, 35 (2003).

The evidence included testimony and statements from both C.L. and M.L. that defendant had them perform sexual acts on each other and on him. Defendant argues that the children's accounts contain conflicting details and therefore lack credibility. However, it is the province of the jury to weigh the credibility of the witnesses. *See id.* at 328, 588 S.E.2d at 35. Although defendant presented evidence to contradict the testimony of C.L. and M.L., upon a motion to dismiss, such discrepancies must be resolved in favor of the State. *Thompson*, 43 N.C. App. at 380, 258 S.E.2d at 800-01. Considered in the light most favorable to the State, there was sufficient evidence to allow the jury to consider two charges of indecent liberties against defendant. We conclude that the trial court did not err in denying defendant's motion to dismiss. This argument is overruled.

**[4]** Finally, defendant asserts in his Motion for Appropriate Relief that his sentence, in the aggravated range, was error pursuant to the decision of the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403 (2004). We agree. The trial court found as an aggravating factor that "defendant took advantage of a position of trust or confidence to commit the offense." Judicial findings of such aggravating factors pursuant to North Carolina's Structured Sentencing Act, specifically N.C. Gen. Stat. § 15A-1340.16(a),(b), and (c), violate defendant's Sixth Amendment right to a jury trial under the United States Constitution. *State v. Allen*, 359 N.C. 425, 438-39, —— S.E.2d ——, —— (July 1, 2005) (No. 485PA04).

In 2000, the U.S. Supreme Court held in *Apprendi v. New Jersey* that "[o]ther than the fact of a prior conviction, any fact that in-

creases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455 (2000). In *Blakely*, the Court further stated that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely*, 542 U.S. at —, 159 L. Ed. 2d at 413-14 (emphasis in original). Our North Carolina Supreme Court applied the rule in *Blakely* to our structured sentencing scheme and determined that "statutory maximum" is equivalent to "presumptive range." *Allen*, 359 N.C. at 437, — S.E.2d at —. Because a jury did not find beyond a reasonable doubt that defendant "took advantage of a position of trust or confidence" to commit indecent liberties, and such error is structural error, reversible *per se*, under *State v. Allen, supra*, we must grant the defendant a new sentencing hearing.

No error in defendant's trial.

Remanded for a new sentencing hearing.

Judges TIMMONS-GOODSON and HUDSON concur.