IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-18

No. 73A20

Filed 12 March 2021

STATE OF NORTH CAROLINA

v.

MOLLY MARTENS CORBETT and THOMAS MICHAEL MARTENS

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 269 N.C. App. 509 (2020), reversing judgments entered on 9 August 2017 by Judge W. David Lee in Superior Court, Davidson County, and remanding for a new trial. Heard in the Supreme Court on 11 January 2021.

*Joshua H. Stein, Attorney General, by Jonathan P. Babb and L. Michael Dodd, Special Deputy Attorneys General, for the State-appellant.*

*Tharrington Smith, L.L.P., by Douglas E. Kingsbery, for defendant-appellee Molly Martens Corbett.*

*Dudley A. Witt, David B. Freedman, and Jones P. Byrd, Jr. for defendant-appellee Thomas Michael Martens.*

EARLS, Justice.

In the early morning hours of 2 August 2015, a Davidson County 911 operator received a call regarding an incident at 160 Panther Creek Court. The caller, Thomas Martens (Tom), reported that his son-in-law, Jason Corbett (Jason), "got in a fight" with his daughter, Molly Martens Corbett (Molly), and that he had found Jason "choking my daughter. He said, 'I'm going to kill her.' " Tom told the dispatcher that

he had hit Jason in the head with a baseball bat. Jason was "in bad shape. We need help. . . . He, he's bleeding all over, and I, I may have killed him." The 911 operator instructed Tom and Molly to perform CPR while emergency medical technicians (EMTs) were dispatched to the home. When they got there, the EMTs found Molly performing chest compressions on Jason in the master bedroom, but Jason did not survive. Law enforcement officers who arrived shortly thereafter found Molly "very obviously in shock." She told the officers she had been choked.

¶ 2    Subsequently, Molly and Tom were charged with and ultimately convicted of second-degree murder for the homicide of Jason. From their first call to 911 through the trial, Molly and Tom did not deny that they had killed Jason. Instead, they maintained that they had lawfully used deadly force to defend themselves while under the reasonable apprehension that they were facing an imminent threat of deadly harm during a violent altercation initiated by Jason. On appeal, a divided panel of the Court of Appeals vacated Molly's and Tom's convictions and ordered a new trial. *State v. Corbett*, 269 N.C. App. 509, 512, *writ allowed*, 373 N.C. 580, *and writ dismissed*, 375 N.C. 276 (2020).

¶ 3    The jury in this case did not have to determine who killed Jason. Instead, they had to decide to believe either Tom's testimony that Jason was threatening to kill Molly and was in the process of choking her to death, or to believe the State's theory that Tom and Molly were the aggressors in the altercation and killed Jason without

justification. After careful review, we agree with the majority below that the trial court committed prejudicial error in excluding evidence that went to the heart of defendants' self-defense claims. The trial court's errors in excluding certain evidence deprived defendants of the full opportunity to put the jury in their position at the time they used deadly force. In turn, this deprived the jury of evidence necessary to fairly determine whether Tom and Molly used deadly force at a moment when they were actually and reasonably fearful for their lives. Accordingly, we affirm the decision of the Court of Appeals and remand to the trial court for a new trial.

## I.   Background

Jason was a citizen and resident of the Republic of Ireland. He had two children, Jack and Sarah, with his first wife, Margaret. Margaret died unexpectedly in 2006, from what the Irish authorities determined to be complications of an asthma attack, just eleven weeks after giving birth to Sarah. In late 2007 or early 2008, Jason hired Molly to work as an au pair in his home in Ireland. The two later began a romantic relationship. In 2011, Jason, Molly, Jack, and Sarah moved to Davidson County, North Carolina, after Jason transferred to an office his employer had recently opened in the United States. Jason and Molly married that same year.

### A. The Altercation

At around 8:30 p.m. on 1 August 2015, Molly's parents, Tom and Sharon Martens, who lived in Tennessee, arrived at the Corbett's home in Davidson County

for a visit. Tom—a retired FBI agent and former attorney—brought an aluminum baseball bat and a tennis racket as gifts for Jack. According to Tom's testimony, Jason had been drinking beer with his neighbor but was pleasant and social during the evening. Jack, who had been at a party at a friend's house, returned home around 11:00 p.m. Because it was late, Tom decided to wait until the following morning to give Jack the bat and tennis racket. Tom and Sharon went to sleep in the guest bedroom, located on the floor below the master bedroom where Jason and Molly typically slept.

¶ 6    Tom testified that in the middle of the night, he was awakened by the sound of thumping on the floor above him, followed by "a scream and loud voices." He thought "it sounded bad . . . like a matter of urgency." He grabbed the baseball bat and ran upstairs toward the source of the noises, which he determined was the master bedroom. Inside the bedroom, Tom encountered Jason and Molly facing each other. Jason's hands were around Molly's neck. Tom testified that he told Jason to let Molly go, to which Jason replied, "I'm going to kill her." Tom again asked Jason to let Molly go, to which Jason again replied, "I'm going to kill her." Jason then "reversed himself so that he had [Molly's] neck in the crook of his right arm" and started dragging Molly toward the bathroom.

¶ 7    According to Tom, he feared that if Jason reached the bathroom with Molly, Jason would close the door and kill her. In an effort to impede Jason, Tom swung the

baseball bat at "the back of the two of them glued together." However, the initial blow apparently had no effect on Jason. From Tom's perspective, it only "further enraged" him. Tom continued striking Jason "to distract him because he now had Molly in a very tight chokehold" and "she was no longer wiggling." Tom was unable to prevent Jason from reaching the bathroom. However, after following Jason into the bathroom, Tom struck Jason in the head with the bat. In response, Jason charged out of the bathroom and back toward the master bedroom, pushing Molly in front of him. Tom continued to swing the baseball bat at Jason to try to separate him from Molly. Eventually, Molly slipped out of Jason's arms, but Jason was able to wrestle the bat out of Tom's grasp. Tom, who had lost his glasses and was pushed to the floor in the struggle, testified that he heard Molly yell "[d]on't hurt my dad," although this portion of his testimony was stricken upon the State's objection. In a written statement admitted into evidence at the trial, Molly maintained that at some point after Jason took the bat from Tom, she "tried to hit [Jason] with a brick (garden décor) I had on my nightstand."

¶ 8    When Tom regained his footing, he saw Molly trapped between Jason and the bedroom wall. He claimed that he was physically weakened and in fear for both his daughter's life and his own. Jason was twenty-six years younger than Tom and outweighed him by more than 100 pounds. Tom testified the following:

> A. . . . I'm on the other side of the room at the end of the bed. And things look pretty bleak. He's got the bat. He's

in a . . . good athletic position. He has his weight down on the balls of his feet. He's kind of looking between me and Molly. And so I decided . . . to rush him and try to get ahold of the bat.

. . . .

A. . . . [A]s desperate as it seemed, it seemed like the only thing to do. And so I rush him and I do get both hands on the bat (demonstrating). Now there are four hands on the bat. And we are struggling over control of the bat. And this is not—this is not good for me. He's bigger and stronger and younger.

. . . .

A. . . . I try to hit him this way with the end of the bat. I try to hit him with this end of the bat. I don't know. I'm trying to hit him with anything I can (demonstrating) and I win. I get control of the bat. He loses his grip. And I hit him. And—

Q. Why did you hit him?

A. Because I don't want him to take the bat away from me and kill me. I mean—just because he lost control of the bat doesn't mean this is over. This was far from over. And so I still think that, you know, he has the advantage even though—'cause I know what I'm feeling like. I'm shaking. I'm not doing good now. And so I hit him. And I hit him until he goes down. And then I step away.

Q. Do you know how many times you hit him?

A. I don't.

Q. And why did you continue to hit him after the first hit?

A. I hit him until I thought that he could not kill me. I thought that he was—I mean, he said he was going to kill Molly. I certainly felt he would kill me. I felt both of our

lives were in danger. I did the best I could.

Tom gathered his thoughts and told Molly "we need to call 911." Both Tom and Molly were themselves "in pretty bad shape," but Molly eventually brought Tom a phone, and they called 911.

**B. The Investigation**

The first EMT to arrive at the scene found Jason on the floor of the master bedroom. He noticed a baseball bat and a brick paver near Jason's body. There was "blood all over the floor and the walls." The EMT could not locate a pulse. When the EMT tried to lift Jason's chin for intubation, the fingers on the EMT's left hand "went inside [Jason's] skull," and he realized that "there was severe heavy trauma to the back of the head." Other EMTs who attempted to revive Jason testified that his body "felt cool" when they arrived and that they observed dried blood. The forensic pathologist who conducted Jason's autopsy concluded that he had died from "multiple blunt force injuries" which included "ten different areas of impact on the head, at least two of which had features suggesting repeated blows indicating a minimum of 12 different blows to the head." According to the forensic pathologist, the "degree of skull fractures . . . are the types of injuries that we may see in falls from great heights or in car crashes under other circumstances."

Corporal Clayton Stewart Daggenhart of the Davidson County Sheriff's Office arrived at the scene at 3:16 a.m. At trial, he testified that he found a naked white

male lying on his back in the master bedroom with "several areas of blood next to him that appeared to be puddled." There were significant amounts of blood on the bedroom wall. Corporal Daggenhart also observed a "brick stone or paving stone and a baseball bat" near the body. A photograph of the brick paver revealed hair "scattered throughout" the markings on its surface. After exiting the bedroom, Corporal Daggenhart encountered Tom and Molly. He did not notice anything "remarkable" about either defendant, other than that Molly had blood on the top of her head. He asked Tom and Molly to exit the house, and then went to Jack's and Sarah's bedrooms to wake the children and escort them outside.

¶ 11    Deputy David Dillard of the Davidson County Sheriff's Office was tasked with observing Molly while law enforcement officers were investigating inside the home. He testified that he noticed dried blood on her forehead and face but no obvious injuries. According to Deputy Dillard, Molly "was making crying noises but I didn't see any visible tears. She was also rubbing her neck." Another officer who photographed Molly in order to document her physical condition testified that she was "continually tugg[ing] and pull[ing] on her neck with her hand." At some point, EMTs who came to check on Molly found her curled up in a fetal position on the grass. They noticed that her neck was red.

¶ 12    When ruling on whether to admit the children's statements at issue in this case, Molly's interview from early that morning at the Davidson County Sheriff's

Office was before the trial court. In the videotaped interview, Molly told the investigators that Jason had been experiencing anger issues which, in recent months, had gotten progressively worse. She stated that Jason had been verbally and physically abusive toward her on numerous occasions and that his outbursts were often triggered by seemingly trivial matters.[1] Molly told investigators that earlier that evening, Jason had become angry at her after being awakened by his daughter, Sarah, who had entered their bedroom after becoming frightened by the designs on her bedsheets. Molly alleged that when she tried to defend Sarah's behavior by pointing out that she was only seven years old, Jason told Molly to "shut up" and began choking her.

¶ 13    Also before the trial court was the fact that at the urgent request of the Davidson County Sheriff's Office, a social worker from the Union County Department of Social Services (DSS) had interviewed Jack, Sarah, and Molly on the day after Jason's death, 3 August 2015. The social worker's arrival was unannounced. Molly was not home when the social worker separately interviewed Jack and Sarah. The social worker's notes reflect that Jack disclosed that "[Jason] gets mad at [Molly] for no good reason" and that "[Jason] curses [Molly]." He also disclosed that "[Jason's anger] can be for anything, such as leaving a light on." Sarah disclosed that "[Jason]

---

[1] Jason's medical records, which were unsealed and admitted as evidence at trial, revealed that a couple of weeks prior to his death, Jason had complained to his doctor about feeling "angry lately for no reason."

is angry on a regular basis," that "seemingly innocuous things . . . set him off," and that "she has seen Jason pull Molly's hair." After Molly returned home, she told the social worker that Jason frequently became angry at both her and the children and that the children would "lie [to Jason] almost daily trying to protect her for fear of what their father may do."

¶ 14    Three days later, on 6 August 2015, Davidson County DSS and the Davidson County Sheriff's Office arranged for Jack and Sarah to complete a child medical evaluation at Dragonfly House, an accredited child advocacy center in Mocksville, North Carolina. The purpose of the child medical evaluation was to determine whether Jack and Sarah had witnessed domestic violence or experienced child abuse and, if necessary, to diagnose the children as victims of child abuse and develop an appropriate treatment plan. Molly's mother, Sharon, drove Jack and Sarah to Dragonfly House immediately following Jason's funeral. At Dragonfly House, Jack and Sarah were seen by a child advocate, a forensic interviewer, and a pediatrician. Jack told the forensic interviewer that his parents "didn't get along very well. . . . My dad got mad about bills, leaving lights on, um, and it he (sic) just got very mad at simple things." He stated that Jason "physically and verbally hurt my mom," that he had witnessed Jason "punching, hitting, [and] pushing" Molly "[o]nce or twice," and that he had noticed Jason "[g]etting madder . . . he's been cussing and screaming a lot more, getting a lot angrier" over the preceding months. Jack told the interviewer

that in the event of a really bad emergency, which he defined as "[h]itting or cussing that would be going on and on and on without stopping for an hour or two, maybe more," the kids knew to call their maternal grandparents and say a "key word" which would summon the grandparents to their home and then hang up the phone. Jack's "key word" was "Galaxy." Sarah's was "Peacock." In response to a question asked at the request of law enforcement, Jack explained that the reason the décor paver was in his parents' bedroom was because "we were going to paint it so it would look pretty, and that—it was in my mom's room, because it was raining earlier, and we already— we were going to paint it. We didn't want it getting all wet. So we brought it inside, and my mom put it at her desk."

¶ 15    During her forensic interview, Sarah also stated that she knew to call her grandma in the event of an emergency and "just say Peacock and hang up the phone, and she would come over to our house." She told the interviewer that Jason "gets really angry" at Molly "for like ridiculous reasons." She described how she would "go downstairs to my parents' bedroom" if she woke up after having a nightmare, but that whenever she went to get Molly, she "tried to go [into the bedroom] as quiet as possible, because my dad—I do not want my dad to wake up, because that's not a good thing. Because he just gets very, very, angry." She further explained that "what caused my dad being really mad" the night of the altercation was that "my mom kept on coming upstairs because I—like I have fairies on my bed, and I really got scared

of those things, because they look like there are spiders and lizards on my bed. So that's why my mom had to keep on coming up [to my room]. I couldn't fall asleep until my mom put another sheet on my bed, and then my dad got mad.

Jack and Sarah were both diagnosed as victims of child abuse and recommended to receive treatment and mental health services. By court order in a separate contested custody proceeding, Jack and Sarah were subsequently placed in the custody of Jason's sister and her husband (Mr. and Mrs. Lynch) in Ireland.

**C. The Trial**

On 18 December 2015, Tom and Molly were indicted for second-degree murder and voluntary manslaughter. Both defendants pleaded not guilty. Because Jack and Sarah were residing in Ireland and unavailable to testify at trial, Molly filed a pre-trial motion seeking to admit the children's statements to the DSS social worker and their statements at Dragonfly House into evidence. The State objected and moved to have all of the children's statements excluded. During a pre-trial hearing, the State submitted to the trial court a video and transcript of Jack being interviewed via Skype from Mr. and Mrs. Lynch's home in Ireland and various unauthenticated materials the children had purportedly written after returning to Ireland. The interview was conducted on 27 May 2016 by an assistant district attorney (ADA) from the Davidson County District Attorney's Office. During the interview, Jack told the ADA that "I didn't tell the truth at Dragonfly" or when he spoke with DSS. He claimed that Molly

coerced the children into lying by telling them that Mr. and Mrs. Lynch would obtain custody and take them back to Ireland, where she would never see them again, unless they told investigators "that our dad was abusive and . . . that he was very mean to Molly." Jack also claimed that Molly had physically abused him. When the ADA asked why he was "telling the truth today" after lying previously, Jack replied "[b]ecause I just want the truth. And I found out what happened to my dad, and I want justice to be served." The trial court ruled that Jack's and Sarah's statements to the DSS social worker and at Dragonfly House were inadmissible hearsay and denied defendants' motion to admit the children's statements into evidence.

¶ 18    Tom and Molly were tried jointly in the Superior Court, Davidson County. The State's case centered on the forensic evidence—which established that Jason had been killed by repeated blows to the head from either the aluminum baseball bat or the brick paver—and testimony from the EMTs and law enforcement officers who were present at the home on the night of Jason's death. In addition, the State presented expert testimony from Stuart H. James, an expert in bloodstain pattern analysis. James testified that based on his review of the photographs and videos taken at the scene of the crime, as well as the physical evidence collected by law enforcement, the bloodstain patterns he examined were "consistent with impacts to the head of [Jason] as he was descending to the floor with his head contacting the south wall in the areas of the impact." According to James, small blood spatters on

the boxer shorts Tom was wearing during the altercation were "impact spatters . . . consistent with the wearer of these boxer shorts in proximity to the victim Jason Corbett when blows were struck to his head" and that blood spatters found on the underside of Tom's boxer shorts "were consistent with the wearer of the shorts close to and above the source of the spattered blood." He also testified that blood spatters on Molly's pajama bottoms indicated that she was near Jason when his head was struck as he was descending to the floor.

¶ 19     Tom and Molly claimed self-defense. Molly did not testify or present evidence. With defendants' consent, the State introduced into evidence the written statement that Molly gave to law enforcement officers in the hours after Jason's death. Tom took the stand and called one character witness. During his testimony, Tom shared his version of the altercation leading to Jason's death, as recounted above. The trial court sustained the State's objection to the portion of Tom's testimony in which he recalled hearing Molly yell "[d]on't hurt my dad." Tom admitted that he had previously made disparaging comments about Jason to a coworker after an incident involving a party Jason attended at Tom's home.

¶ 20     On 9 August 2017, the jury returned verdicts finding both defendants guilty of second-degree murder. The defendants were each sentenced to a term of 240 to 300

months imprisonment. They gave oral notice of appeal in open court.[2]

**D. The Court of Appeals' Decision**

Although defendants raised thirteen issues on appeal, the Court of Appeals described the ultimate question at trial as "deceptively simple, boiling down to whether Defendants lawfully used deadly force to defend themselves and each other during the tragic altercation with Jason." *Corbett*, 269 N.C. App. at 512. Relevant for the purposes of our review, defendants challenged (1) the trial court's exclusion of Jack's and Sarah's statements to DSS and at Dragonfly House, (2) the trial court's admission of a portion of James's expert testimony based upon his examination of the blood spatters found on Tom's boxer shorts and Molly's pajama bottoms; and (3) the trial court's exclusion of Tom's testimony that he heard Molly yell "[d]on't hurt my dad." *Id.* at 582. A majority of the Court of Appeals concluded that (1) Jack's and Sarah's statements were admissible hearsay under both N.C.G.S. § 8C-1, Rule 803(4) and Rule 803(24); (2) James's testimony regarding the boxer shorts and pajama bottoms was inadmissible expert testimony because it did not meet the requirements of N.C.G.S. § 8C-1, Rule 702(a); and (3) Tom's stricken testimony that he heard Molly say "[d]on't hurt my dad" was "either non-hearsay, or alternatively, admissible

---

[2] Defendants also filed a Motion for Appropriate Relief (MAR) on 16 August 2017 and a supplemental MAR on 25 August 2017 alleging juror misconduct and other violations of their constitutional rights. The trial court denied the MARs without conducting an evidentiary hearing, and the Court of Appeals affirmed. *State v. Corbett*, 269 N.C. App. 509, 521 (2020). Those issues are not before us because they were not a basis for the dissenting opinion below. *See* N.C. R. App. P., Rule 16(b).

hearsay." *Id.* at 560. Judge Collins concurred in part and dissented in part with regard to the majority's resolution of the defendants' evidentiary challenges, arguing that the trial court did not prejudicially err.[3] Upon close examination of the record, we affirm the decision of the Court of Appeals.

## II.     Evidentiary Errors

### A.  Jack's and Sarah's Statements

¶ 22          At trial, parties are generally permitted to present evidence to the jury that is relevant and admissible, subject to the limitations of N.C.G.S. § 8C-1, Rule 403. *See, e.g.*, *State v. McElrath*, 322 N.C. 1, 13 (1988) ("Relevant evidence, as a general matter, is considered to be admissible."). "Evidence is relevant if it has any logical tendency to prove a fact in issue." *State v. Goodson*, 313 N.C. 318, 320 (1985). Portions of Jack's and Sarah's statements to the DSS investigator and at Dragonfly House were plainly relevant to defendants' case for at least three reasons. First, Jack's and Sarah's disclosures regarding the nature of their parents' relationship presented circumstantial evidence tending to support defendants' account of the altercation which resulted in Jason's death. Second, Jack's statement to the forensic investigator providing an innocent explanation for the presence of the brick paver tended to corroborate Molly's written statement, introduced by the State and admitted into

---

[3] The Court of Appeals also held that the trial court erroneously instructed the jury on the aggressor doctrine with regard to Tom. Because we agree with the Court of Appeals that the trial court's evidentiary errors were prejudicial, we do not need to reach the question of whether the trial court erred by giving the aggressor-doctrine instruction.

evidence, that she "tried to hit [Jason] with a brick (garden décor) I had on my nightstand." Conversely, it tended to detract from the State's argument that Molly's account was not credible because, as the prosecutor argued, "there is nothing else having to do with landscaping or gardening or building walls inside that bedroom." Third, Sarah's statement explaining her nightmare tended to support Molly's claim that Sarah's arrival in the master bedroom angered Jason and precipitated the altercation.

¶ 23     Although relevant, Jack's and Sarah's statements were out-of-court statements offered for the truth of their content, making them hearsay. N.C.G.S. § 8C-1, Rule 801(c) (2019). (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."), "Hearsay is not admissible except as provided by statute or the Rules of Evidence." *State v. Hinnant*, 351 N.C. 277, 283 (2000). The Court of Appeals held that the trial court erred by failing to admit Jack's and Sarah's statements at Dragonfly House pursuant to Rule 803(4)—the medical diagnosis or treatment exception—and their statements at Dragonfly House and to DSS pursuant to Rule 803(24)—the residual exception. After careful consideration, we substantially agree with the reasoning and conclusions of the majority below concerning Rule 803(4) with regard to the statements given at Dragonfly House and concerning Rule 803(24) with regard to their statements to the social worker at their uncle's house.

We first address the exception to the hearsay rule for statements made for the purpose of medical diagnosis or treatment.[4]

### 1. *The Medical Diagnosis or Treatment Exception*

¶ 24        Defendants argue that Jack's and Sarah's statements at Dragonfly House were admissible under Rule 803(4) because they were made for the purpose of diagnosing the children as victims of child abuse. Pursuant to Rule 803(4), "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof" are admissible as hearsay "insofar as [the statements are] reasonably pertinent to diagnosis or treatment. N.C.G.S. § 8C-1, Rule 803(4) (2019). We have interpreted Rule 803(4) to "require[ ] a two-part inquiry: (1) whether the declarant's statements were made for purposes of medical diagnosis or treatment; and (2) whether the declarant's statements were reasonably pertinent to diagnosis or treatment." *Hinnant*, 351 N.C. at 284.[5] A trial court's determination that

---

[4] The trial court's written order refers only to Rule 803, but the defendants moved for admission of the statements under both Rule 803 and Rule 804.

[5] The majority below reversed the trial court's order finding that the statements were not pertinent to medical diagnosis or treatment, but the dissenting judge expressly declined to address this holding. Before this Court, the State does not argue that the statements Jack or Sarah made at Dragonfly House are inadmissible under the second prong of the *Hinnant* test. Accordingly, the State has abandoned any argument that Jack's and Sarah's statements should be excluded as not reasonably pertinent to their medical diagnosis or treatment. *See* N.C. R. App. P. 28(b)(6); *State v. Augustine*, 359 N.C. 709, 738 (2005) ("Because defendant presents no argument and cites no authority in support of these contentions, they are deemed abandoned.").

an out-of-court statement is inadmissible under Rule 803(4) is reviewed de novo. *State v. Norman*, 196 N.C. App. 779, 783 (2009) (citing *Hinnant*, 351 N.C. at 284).[6]

¶ 25     The conceptual foundation of Rule 803(4) is "the rationale that statements made for purposes of medical diagnosis or treatment are inherently trustworthy and reliable because of the patient's strong motivation to be truthful." *Hinnant*, 351 N.C. at 284. At its core, the exception is predicated on the presumptive trustworthiness of a declarant who "is motivated to describe accurately his or her symptoms and their source" in order to obtain a proper diagnosis and appropriate treatment. *Id.* at 285, (quoting *R.S. v. Knighton*, 125 N.J. 79, 85 (1991)). However, in some circumstances, the subjective motivation of a declarant may be difficult to ascertain. In *Hinnant*, we noted "the difficulty of determining whether a [child] declarant understood the purpose of his or her statements." *Id.* at 287. Even in a setting where it would be

---

[6] In disputing the appropriateness of reviewing the trial court's admissibility determination de novo, the dissent claims that because our case law regarding this issue is "non-existent, we can look to the federal rules for guidance." In fact, we do have case law on point regarding this issue that we should follow or expressly overrule for good cause, not ignore. Although this Court has not previously explicitly elaborated at length the standard of review which governs a challenge to a trial court's determination regarding the admissibility of hearsay under Rule 803(4), our numerous opinions interpreting Rule 803(4) establish that the Court has routinely reviewed these decisions de novo without affording deference to the trial court's determination. *See, e.g.*, *Hinnant*, 351 N.C. at 285; *State v. Jones*, 339 N.C. 114, 146 (1994); *State v. Stafford*, 317 N.C. 568, 571 (1986). In addition, although decisions of the Court of Appeals are not binding on this Court, the fact that the Court of Appeals has interpreted our precedents as making clear that the admissibility of hearsay under Rule 803(4) is reviewed de novo further confirms that there exists settled precedent in the State of North Carolina, notwithstanding decisions of the federal courts which may have arrived at different conclusions.

obvious to an adult declarant, a child declarant may be confused or unclear about precisely why certain questions are being asked. In contrast to an adult, a child is unlikely to be able to independently and affirmatively seek out medical treatment or even know when medical treatment may be necessary. In addition, professionals who are responsible for the well-being of children may, understandably, tailor their approach to eliciting sensitive health information to account for a child's unique perceptions and vulnerabilities.

¶ 26    Given these challenges, some jurisdictions have been reluctant to apply Rule 803(4) to admit hearsay statements given by child declarants. North Carolina has charted a different course. This Court has instead sought to adhere to "the common law rationale underlying Rule 803(4)" in cases involving child declarants by closely analyzing the "objective record evidence to determine whether the declarant had the proper treatment motive." *Id.*; *see also State v. Stafford*, 317 N.C. 568, 574 (1986). Rather than a bright-line rule, we have instructed trial courts to "consider all objective circumstances of record surrounding [the] declarant's statements in determining whether he or she possessed the requisite intent under Rule 803(4)." *Hinnant*, 351 N.C. at 288. Accordingly, in determining the admissibility of Jack's and Sarah's statements, we look primarily to "objective circumstances" in deciding whether or not the children possessed the requisite "motivation to provide truthful information" which assures the reliability of otherwise inadmissible hearsay. *Id.* at

288 (quoting *United States v. Barrett*, 8 F.3d 1296, 1300 (8th Cir. 1993)).

¶ 27 The first prong of the *Hinnant* test requires us to examine the specific context in which Jack's and Sarah's statements were made. As the majority below correctly noted, our analysis is not limited to any one specific factor, and no specific factor is dispositive. *Corbett*, 269 N.C. App. at 530–31. However, we find the following three factors articulated in *Hinnant* to be most probative in determining the reliability of the children's statements: (1) whether "some adult explained to the child the need for treatment and the importance of truthfulness"; (2) "with whom, and under what circumstances, the declarant was speaking"; and (3) "the surrounding circumstances, including the setting of the interview and the nature of the questioning." *Hinnant*, 351 N.C. at 287–88. In the present case, our analysis of each of these three factors strongly supports admitting the statements Jack and Sarah made during their interviews at Dragonfly House.

¶ 28 First, the intake procedure at Dragonfly House included a thorough, age-appropriate explanation of the overarching medical purpose of the children's visit. Unlike in *Hinnant*, where neither the interviewer "[n]or anyone else explained to [the child] the medical purpose of the interview or the importance of truthful answers," both were explained in significant detail to Jack and Sarah. *Id.* at 289–90. When the children arrived at Dragonfly House, a child advocate explained the child medical evaluation process "at their level" to "make[ ] sure that they understand and . . . know

what to expect" during their "forensic interview and medical exam." The children

were informed that while they are being interviewed by a forensic interviewer, their

"caregiver will be talking with our doctor. Our doctor will be asking questions about

your health throughout your whole life." The forensic interviewer then provided Jack

and Sarah with examples of the types of questions they would be expected to answer

and a detailed description of the medical examination they would undergo

immediately after the interview. The forensic interviewer testified that before

beginning any interview, she articulates the following three ground rules that the

children must understand and adhere to, each of which emphasizes the importance

of truthfulness:

> [The] rules are to—do you know the difference between a
> truth and a lie? We get them to establish they know the
> difference. The second rule is if I make a mistake, you can
> correct me to let them know while I'm an adult, you can tell
> me I'm wrong. If I ask you a question that you don't know
> the answer to, it's okay to say you don't know. We don't
> want you to guess at anything.

To reinforce the importance of telling the truth, the child advocate will "show them

the cameras and show them the rules and tell them where they are being recorded"

before they "start the actual interview process." The intake procedure and the

structure of the children's entire visit to Dragonfly House are designed to help the

treating physician "find out the truth regardless of what that is," in order to help the

organization fulfill its "primary purpose" of serving "the physical and mental

wellbeing of the child." The reliability of the children's testimony is enhanced by Dragonfly House's adherence to procedures that experts in child psychology rely upon to determine if children can distinguish between truth and fiction and provide truthful statements. *See State v. Thornton*, 158 N.C. App. 645, 650 (2003) (finding the fact that "[t]he Center [for Child and Family Health in Durham] utilizes a team approach to the diagnosis and treatment of sexually abused children" supported admissibility).

Second, the children were interviewed by a trained professional specifically employed to elicit truthful information from children suspected to have recently experienced child abuse. Although it is true that Jack and Sarah did not make the statements at issue directly to a medical doctor, statements "need not have been made to a physician" to be admitted under Rule 803(4). *State v. Smith*, 315 N.C. 76, 84 (1985) (quoting the official commentary to Rule 803(4)). Instead, we examine the role of the person to whom the child declarant makes the statements, that person's relationship (if any) to the child's treating physician, and the way in which that person's function has been communicated to the child in order to ascertain whether the statements are "inherently trustworthy and reliable" based upon the declarant's "interest in telling or relaying to medical personnel as accurately as possible the cause for the patient's condition." *Id.*

The objective circumstances of Jack's and Sarah's interviews demonstrate they

likely understood that the information they provided would be used for their diagnosis and treatment. Prior to Jack's and Sarah's forensic interviews, the child advocate made clear to the children that the forensic interview and medical examination were both necessary components of the child medical evaluation. The interviewer told the children that their interviews were being recorded and that other members of Dragonfly House's "multi-disciplinary team"—which includes a physician—might review them. Immediately after finishing the interviews, the forensic interviewer "discuss[ed] that information that [she] had gathered" with the treating physician, for the purpose of "aid[ing] [the physician] in her physical exam of the children . . . so she can perform that physical exam best for that child." Further, the physician's anticipated, customary, and actual use of the information gleaned from the forensic interviews in diagnosing and treating Jack and Sarah is an objective indicator of the reliability of their statements.

In addition, we agree with the Court of Appeals that the "child-friendly atmosphere and the separation of the examination rooms do not indicate that the children's statements during the interviews were not intended for medical purposes." *Corbett*, 269 N.C. App. at 534. The reason Dragonfly House utilizes a child-friendly approach in conducting child medical evaluations is because research demonstrates that it is the best way to obtain reliable information from children who may have

recently experienced abuse.[7] With an adult patient, it is reasonable to expect that a medical professional would elicit the kind of substantive information Jack and Sarah provided to the forensic interviewer. An adult would typically complete a form in the waiting room or disclose the information directly to a nurse or physician in the examination room. But Dragonfly House, in accordance with state policy and national best practices, has determined that such an approach would be ill-suited to the sensitive task of obtaining this information from children. Indeed, the stated purpose of relying upon a forensic interviewer is to ensure that the interview is "done by someone who is trained to talk to children in a non-leading manner in a format that is approved on a national level while being recorded." Dragonfly House needs reliable information in order to serve its primary purpose of serving the well-being of children. They utilize this method of evaluating children to increase the likelihood that the information the physician receives will be reliable. Based on existing best practices developed by medical professionals treating child abuse victims, their approach supports, rather than detracts from, the reliability of Jack's and Sarah's statements.

---

[7] The executive director of Dragonfly House testified that they conduct child medical evaluations while utilizing procedures approved by the North Carolina Department of Health and Human Services, based on a program established by the University of North Carolina at Chapel Hill. In addition, as an accredited children's advocacy center, Dragonfly House must "meet the accreditation standards and guidelines set forth by the National Children's Alliance," a national professional membership organization which develops best practices to "support child abuse victims" by "help[ing] children and families heal in a comprehensive, seamless way so no future is out of reach." *See* National Children's Alliance, *Our Story*, https://www.nationalchildrensalliance.org/our-story (last visited Feb. 28, 2021).

*See State v. Shore*, 258 N.C. App. 660, 676 (2018) (statements obtained by forensic examiner at child advocacy center deploying best practices in interviewing children sufficiently reliable to form basis of expert witness's testimony).

Finally, the "setting" of Jack's and Sarah's interviews and the "nature of the questioning" by the forensic interviewer both support defendants' argument that the children's statements were reliable and therefore admissible as an exception to the hearsay rule under Rule 803(4). The forensic interview took place "one room down and across the hall" from the room where the children were physically examined by the treating physician. The physical examination immediately followed the forensic interview. Thus, the interview was both spatially and temporally proximate to Jack's and Sarah's interactions with the physician—the children were told in advance to expect, and did indeed experience, "a seamless transition from the forensic interview into the physical exam." This is a strong objective indicator that the children understood the forensic interview and the physical examination as two aspects of a single, integrated process—their child medical evaluations—rather than discrete, unrelated events. *See State v. Lewis*, 172 N.C. App. 97, 104 (2005) (finding probative of reliability the fact that "[t]he interviews took place . . . immediately prior to an examination by a doctor."); *Thornton*, 158 N.C. App. at 650 (finding probative of reliability the fact that "[b]oth the physical examination and the initial interview were conducted on [the same day]").

¶ 33        In addition, the protocol used by the forensic interviewer, which is based on a "national model" that "all [forensic interviewers] have to follow," prohibits the kind of questioning that might give cause to doubt the reliability of the children's answers. The interviewer is not permitted to "ask leading questions or suggest answers or suggest topics to the children" and instead relies upon "open-ended" questions designed to allow the children to freely share their own narrative. This style of interview stands in stark contrast to the circumstances in *Hinnant*, where this Court held inadmissible statements obtained through an "entire interview [which] consisted of a series of leading questions, whereby [the interviewer] systematically pointed to the anatomically correct dolls and asked whether anyone had or had not performed various acts with [the child]." *Hinnant*, 351 N.C. at 290. *Cf. Thornton*, 158 N.C. App. at 651 (concluding that statements elicited by an interviewer who asked the child "very general questions about her home life, and 'very general and nonleading' questions about any touching that may have occurred" were admissible).

¶ 34        The State does not meaningfully dispute that the objective circumstances of Jack's and Sarah's interviews at Dragonfly House "indicate that the children understood that the purpose of the interviews was to obtain medical diagnosis or treatment." *Corbett*, 269 N.C. App. at 532. In its brief, the State assures this Court that, as a general matter, it believes that statements made during interviews conducted at a child advocacy center like Dragonfly House should be admitted under

Rule 803(4). The State expressly disclaims the argument that "there was any error with the questions asked by [Dragonfly House] or the procedures used in the [ ] interviews in this case, all of which was proper." Instead, the State argues that this case is different because when asked by the interviewer to "[t]ell me why you're here," Sarah responded "[b]ecause my dad died," and Jack responded, "my dad died, and people are trying—my aunt and uncle from my dad's side are trying to take away— take me away from my mom." In the State's view, those answers explicitly demonstrate that the children did not understand their interviews to be for the purpose of medical diagnosis, and therefore, the rationale that statements made for the purpose of medical diagnosis are likely to be reliable does not apply.

¶ 35 The problem with this argument is that the standard under Rule 803(4), developed in our case law and interpreted in the context of assessing statements made by child patients, does not look to whether the child has explained the purpose of the interview to the interviewer in any particular manner. Instead, we ask whether the interviewer explained to the child the importance of being truthful and whether the interview occurred in circumstances which indicate that "the child understood the [witness'] role in order to trigger the motivation to provide truthful information." *Hinnant,* 351 N.C. at 288 (alteration in original) (quoting *Barrett,* 8 F.3d at 1300). Indeed, the children's own statements at other points in the interview dispel the notion that that they failed to grasp the importance of being truthful. Sarah

told the forensic interviewer that "everybody's like just say what's the truth. . . . And my mom just says, tell the truth, Sarah. That's all she says." Jack told the interviewer that when he learned he was being taken to Dragonfly House, he was "nervous at first, but then . . . my grandma and mom said everything's going to be fine. You're just going to ask me some questions, and they wanted me to tell the truth." The State's narrow argument otherwise stands in significant tension with its typical position when litigating criminal prosecutions which rely on child declarants. *See Corbett*, 269 N.C. App. at 537 ("Most often it is the State seeking [the] admission" of "this type of evidence in cases involving children"). As one law enforcement officer testified at trial, he had brought "[o]ver 500" children to Dragonfly House for treatment since it opened in 2010, and he agreed that these types of forensic interviews were extremely helpful in the prosecution of individuals.

¶ 36  Here, the Court of Appeals correctly concluded that Jack's and Sarah's statements in response to the question asking why they were at Dragonfly House do not change the outcome of the analysis under the first prong of the *Hinnant* test. Jack's and Sarah's answers were not inconsistent with an understanding of the overarching medical purpose of their visit to Dragonfly House and the need for them to be truthful. In their answers, Jack and Sarah properly identified the event which triggered their referral to Dragonfly House to be treated for possible physical and psychological trauma. If the event triggering Jack and Sarah's visit to Dragonfly

House had been a car accident and they had responded to the question "why are you here" with the statement "I am here because I was in a car accident," this answer would not be proof that the children did not understand that they were receiving medical treatment. It would prove only that they had a basic understanding of cause and effect. The same is true here. The violent death of their father at the hands of the people they considered their mother and grandfather was relevant to their need for medical evaluation. Their diagnosis and treatment for the condition of experiencing child abuse illustrate that for Jack and Sarah, the circumstances of their father's death and their medical needs were intertwined. Similarly, Jack's awareness that the outcome of his medical examination might have implications for his custody situation—a proposition which is likely true anytime a child is examined at Dragonfly House—is not evidence that he did not understand the medical purpose of his visit or the need to be truthful.

As described above, the basic premise of *Hinnant* is that given the inherent difficulties in ascertaining a child declarant's subjective motivations—and the child's comparative lack of agency in seeking out medical treatment and lack of understanding of when medical treatment is necessary relative to an adult—a trial court "should consider *all objective circumstances of record* surrounding [a] declarant's statements in determining whether he or she possessed the requisite intent under Rule 803(4)." *Hinnant*, 351 N.C. at 288 (emphasis added). As the Court

of Appeals correctly held in an earlier case, it is highly probative of Jack's and Sarah's motivations for truthfulness that they were interviewed in private, that they discussed sensitive topics in a "comfortable and 'safe' environment," and that the interviewer "did not use leading questions" or "ask [the child] many specific questions" while " 'adher[ing] to the protocol' established by . . . a 'licensed and accredited child advocacy center.' " *In re M.A.E.*, 242 N.C. App. 312, 321–22 (2015). The objective circumstances of the interview at Dragonfly House indicate that Jack's and Sarah's statements were made for the purpose of obtaining medical diagnosis or treatment and were reliable.

¶ 38     It would turn *Hinnant* on its head to disregard the "objective circumstances of record," which overwhelmingly point toward admitting the children's statements, and instead base our decision on a child's single response of ambiguous significance to a question posed early in the interview process. We hold that defendants have met their burden of "affirmatively establish[ing] that the declarant[s] had the requisite intent by demonstrating that the declarant made the statements understanding that they would lead to medical diagnosis or treatment." *Hinnant*, 351 N.C. at 287. Accordingly, we affirm the Court of Appeals' holding that the trial court erred by ruling that Jack's and Sarah's statements regarding Jason and Molly's relationship and the children's statements regarding their own relationships with Jason and Molly were inadmissible.

### 2. *Residual Hearsay Exception*

¶ 39    In addition to challenging the Court of Appeals' conclusion that Jack's and Sarah's statements at Dragonfly House were admissible under Rule 803(4), the State argues that the majority below erred in holding that the children's statements to the DSS social worker and at Dragonfly House were both admissible under Rule 803(24). Because we agree with the Court of Appeals that the trial court erroneously excluded the children's statements at Dragonfly House under the medical diagnosis or treatment exception, we now consider whether the children's statements to the DSS social worker were admissible under Rule 803(24).[8] We hold that the trial court abused its discretion in failing to admit Jack's and Sarah's statements to the DSS social worker under the residual exception to the hearsay rule because the trial court's conclusions of law rested on unsupported factual findings and because those conclusions cannot otherwise be supported by the record evidence.

¶ 40    The "residual exception" provides that a hearsay statement "not specifically covered by any of the" other enumerated exceptions is admissible if it possesses "equivalent circumstantial guarantees of trustworthiness." N.C.G.S. § 8C-1, Rule 803(24) (2019). A statement possesses "circumstantial guarantees of trustworthiness"

---

[8] Because Rule 803(24), the residual hearsay exception, applies only if a hearsay statement is not specifically covered by another exception to the hearsay rule, there is no need to consider whether the children's statements made at Dragonfly House are also admissible under this exception. *See* N.C.G.S. § 8C-1, Rule 803(24) (2019).

if

> the court determines that (A) the statement is offered as
> evidence of a material fact; (B) the statement is more
> probative on the point for which it is offered than any other
> evidence which the proponent can procure through
> reasonable efforts; and (C) the general purposes of these
> rules and the interests of justice will best be served by
> admission of the statement into evidence.

*Id.* A trial court's determination as to the admissibility of hearsay statements

pursuant to Rule 803(24) is reviewed for abuse of discretion. *See State v. Smith*, 315

N.C. 76, 97 (1985).

¶ 41      In order to facilitate effective judicial review of a decision to admit or exclude

statements under the residual exception, a trial court must "make adequate findings

of fact and conclusions of law sufficient to allow a reviewing court to determine

whether the trial court abused its discretion in making its ruling." *State v. Sargeant*,

365 N.C. 58, 65 (2011). These findings must address

> (1) whether proper notice has been given, (2) whether the
> hearsay is not specifically covered elsewhere, (3) whether
> the statement is trustworthy, (4) whether the statement is
> material, (5) whether the statement is more probative on
> the issue than any other evidence which the proponent can
> procure through reasonable efforts, and (6) whether the
> interests of justice will be best served by admission.

*State v. Valentine*, 357 N.C. 512, 518 (2003). We have deemed the third factor, the

trustworthiness of the statement, to be the "most significant requirement." *Smith*,

315 N.C. at 93. When assessing trustworthiness, a trial court considers the following,

non-exhaustive set of factors: "(1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination." *State v. Triplett*, 316 N.C. 1, 10–11 (1986).[9]

¶ 42     In the present case, the trial court made findings of fact which track all four of these factors before concluding that "[t]he proffered statements do not have circumstantial guarantees of trustworthiness." However, upon close examination of the record, we agree with the Court of Appeals that these findings were fundamentally flawed. "If the trial court . . . makes erroneous findings, we review the record in its entirety to determine whether that record supports the trial court's conclusion concerning the admissibility of a statement under a residual hearsay exception." *Sargeant*, 365 N.C. at 65. Thus, after identifying the trial court's erroneous findings, we independently examine the record to determine if the trial court's ultimate conclusion regarding the admissibility of evidence under the residual exception can be supported. We hold that the trial court's conclusion that the statements lacked trustworthiness is not and cannot be supported by the evidence in the record.

---

[9] There is no dispute regarding the fourth factor of the *Triplett* test, the "practical availability" of the children at trial, as the children were living with their paternal aunt and uncle in Ireland and had not returned to the United States to testify.

¶ 43        First, the trial court determined that it was "not assured of the personal knowledge of the declarants as to the underlying events described" based on its factual finding that "both children identified the source of their knowledge being nothing more than statements of [Molly] and [Molly's] mother. The declarations contain no reference to seeing, hearing or perceiving anything about the events described except these statements of others." This conclusion is not supported by the text of the DSS social worker's record of the interviews with Jack and Sarah. At least some of the relevant and material statements proffered by defendants were based on the children's firsthand knowledge of incidents they contemporaneously saw, heard, or perceived. For example, Jack told the DSS social worker that "his dad curses his mom; he stated that he has seen his dad a few times hit his mom with his fist anywhere on her body that he can." He stated that both he and his sister "tried to stop the fighting by yelling at his parents asking them to stop and by trying to push them apart." Sarah told the DSS social worker that her "dad fights her mom" and "she gets in trouble because her dad gets angry at her for saying [to] stop [fighting]" but that "she doesn't say stop to her mom because her mom is not doing anything wrong she is just [standing] up for herself." She stated that "her dad is angry on a regular basis . . . if you leave a light on he gets angry, or if you leave a door open or do not walk the dog her father gets angry and . . . they (her mother and father) go into their room." She stated that "she saw her dad smack her mom across the face

with an open hand," so she "ran into the bathroom [with Jack] and brushed [her] teeth and pretended that [she] did not see it."

¶ 44    To be sure, in response to some questions, Jack and Sarah disclosed that the information they were conveying was communicated to them by Molly. The trial court's conclusion that the children's statements lacked trustworthiness also rested on its unsupported determination that it was "not assured of the children's motivation to speak the truth, but instead finds the children were motivated, in the near immediate aftermath of the death of their father, to preserve a custody environment with the only mother-figure they could remember having known during their lives." In assessing a declarant's motivation for truthfulness, "the issue is not whether [the declarant's] statement is objectively accurate; the determinative question is whether [the declarant] was motivated to speak truthfully when" the statement was made. *Sargeant*, 365 N.C. at 66. The inquiry does not require defendants to prove that every statement made by Jack and Sarah was truthful. Instead, it requires the trial court to determine if the declarants had "reason to lie" or "would have benefitted from altering the[ir] story." *Valentine*, 357 N.C. at 519.

¶ 45    In lieu of direct evidence, the State emphasizes that Jack and Sarah desired to remain in Molly's care and were aware that their custody may be at issue in the aftermath of their father's death. In essence, the State asks us to presume Jack's and Sarah's motivations to lie because they expressed a desire to remain with their sole

surviving caregiver and perceived that their family circumstances might change in the aftermath of a violent altercation which resulted in the death of their only then-living biological parent. We have never held that only children who do not like their parents or who are blind to the potential consequences of a destabilizing family crisis possess a motivation for truthfulness, and we reject the invitation to do so here.

¶ 46        Of course, a trial court does not abuse its discretion when in an exercise of that discretion it assigns different weight to different pieces of evidence in arriving at a determinative legal conclusion. When examining the trial court's order, we do not "reweigh the evidence and make our own factual findings on appeal, a task for which an appellate court like this one is not well suited." *State v. Rodriguez*, 371 N.C. 295, 319 (2018). Even if the record contains significant evidence that the children possessed a motivation for truthfulness, we would be compelled to affirm the trial court's order if there were evidence in the record "tending to support a contrary determination." *Id.* In this case, however, the record is bereft of evidence supporting the trial court's conclusion that the children lacked a motivation for truthfulness.

¶ 47        Finally, we conclude that the trial court's finding that Jack's and Sarah's statements "were specifically recanted and disavowed" is unsupported by the record. The children's subsequent statements calling into question the reliability of their statements to the DSS social worker and at Dragonfly House are not evidence that all of their statements lacked trustworthiness. The primary basis for the trial court's

finding that the statements were recanted was the Skype interview with Jack conducted by the ADA, during which Jack stated that he "told the person who was interviewing [him (the DSS social worker and Dragonfly House forensic interviewer)] exactly what [Molly] told me to say." In addition, the trial court found that Sarah "recanted her statements in diary entries made after her return to Ireland." We do not dispute the trial court's authority to rely upon these sources of evidence in making a threshold determination as to the admissibility of Jack's and Sarah's statements under the residual exception.[10] However, this evidence in no way calls into question all of the statements the children made which were relevant and probative to defendants' self-defense claims.

¶ 48        In his Skype interview, Jack stated that while in the car on the way to Dragonfly House, Molly "started making up little stories about my dad, saying that

---

[10] In justifying its conclusion that the trial court erred by failing to admit Jack's and Sarah's statements under the residual exception, the majority below stated that "it is unclear from finding of fact #22 why the trial court deemed the 'diary entries' or the circumstances of Jack's Skype interview with a member of the district attorney's office to be more trustworthy than either of the objective and impartial interviews at issue here." *Corbett*, 269 N.C. App. at 545. There may have been valid reasons for questioning the reliability of Jack's and Sarah's post-trial recantations. Notably, Jack's statement contained allegations that were internally inconsistent or flatly contradicted by the evidentiary record, and Sarah's diary entries were not authenticated. In addition, Jack explicitly stated that the reason he was recanting his prior statements was because he "found out what happened to my dad" after having begun living with Jason's sister in Ireland. Nevertheless, we agree with the State that the trial court was entitled to consider Jack's Skype interview and Sarah's diary entries, regardless of whether either would ultimately have been deemed admissible evidence, in making a preliminary determination regarding the admissibility of the Dragonfly House interview and DSS interview. *See* N.C.G.S. § 8C-1, Rule 104(a).

he was abusive. And then she started crying, and she said if you don't tell the truth, we'll never, ever see you again. If you don't tell this, we'll never see you again." When the ADA asked Jack to clarify what he meant by "this," Jack responded "[l]ike what she was telling us to say. She was telling us to say that our dad was abusive and saying that he was very mean to Molly." When asked if he could share "any more of the stories [Molly] told you to tell," Jack replied, "[n]o." There is some reason to doubt that this exchange occurred as Jack recalled it, given that the testimony of the staff at Dragonfly House establishes that Molly did not accompany Jack and Sarah to that interview. Regardless, even if this exchange did occur, it occurred *after* Jack and Sarah were interviewed by the DSS social worker on 3 August 2015. Notably, the DSS social worker's visit was unannounced and Molly was not present at the time. Jack's recantation was limited in nature—at most, he recanted his previous claims that Jason was abusive toward Molly and the children—not a specific disavowal of every statement he had made during his DSS interview. Accordingly, the record cannot support the trial court's conclusion that Jack and Sarah "specifically recanted and disavowed" all of the relevant, probative statements they made to the DSS social worker.

¶ 49      The trial court's ultimate conclusion that Jack's and Sarah's statements to the DSS social worker were not trustworthy was "made on the basis of inaccurate and incomplete findings of fact used to reach unsupported conclusions of law." *Sargeant*,

365 N.C. at 67. After close examination of the record, it is apparent that this conclusion is "not supported by competent evidence in the record." *Id.* at 65. Having determined that defendants have met their threshold requirement of proving the trustworthiness of the proffered statements, we conclude that the other factors enumerated in *Valentine* also support admitting Jack's and Sarah's statements under the residual exception. The proponents gave proper notice. The substance of Jack's and Sarah's statements were not adequately covered by any other source of evidence. For reasons more fully explained in the section of this opinion examining prejudice, Jack's and Sarah's statements were material and probative and their admission serves the interests of justice by enabling Tom and Molly to present an adequate defense. Accordingly, we conclude that it was an abuse of discretion for the trial court to exclude the statements that Jack and Sarah made in their interviews with the DSS social worker under the residual exception to the hearsay rule contained in Rule 803(24).

### 3. *The Expert's Bloodstain Pattern Analysis*

During its case-in-chief, the State presented testimony from Stuart H. James, qualified as an expert in bloodstain pattern analysis, who offered his opinion about the location of Tom, Molly, and Jason at various points during the altercation. Most significantly, James testified that in his opinion the bloodstain patterns located on Tom's and Molly's clothing suggested that one or both of them struck Jason in the

head as he was descending toward the floor and struck Jason from above while his head was near the floor. The trial court determined that James's testimony was admissible under Rule 702(a). The Court of Appeals reversed, and the State appealed.

¶ 51 To admit expert opinion testimony under Rule 702(a), a trial court must conduct a three-step inquiry to determine (1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable. *State v. McGrady*, 368 N.C. 880, 892 (2016). As defined by Rule 702(a), expert opinion testimony is reliable

> if all of the following apply: (1) The testimony is based upon sufficient facts or data. (2) The testimony is the product of reliable principles and methods. (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C.G.S. § 8C-1, Rule 702(a) (2019). In assessing reliability, the trial court considers the five non-exhaustive factors articulated by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), as well as "other factors that may help assess reliability given 'the nature of the issue, the expert's particular expertise, and the subject of his testimony.' " *McGrady*, 368 N.C. at 891 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). A trial court's ruling as to the admissibility of proffered expert testimony "will not be reversed on appeal absent a showing of abuse of discretion." *SciGrip, Inc. v. Osae*, 373 N.C. 409, 418 (2020) (citing *McGrady*, 368 N.C. at 893).

¶ 52        Before this Court, the parties' sole dispute centers on one portion of James's testimony: his testimony that was based upon purported blood spatters found on the underside of Tom's boxer shorts and at the bottom of Molly's pajama pants. The majority below held that because these purported blood spatters were never tested to confirm that they were in fact Jason's blood, in violation of the protocol set out in a "peer-reviewed treatise" that James himself co-authored, *Corbett*, 269 N.C. App. at 554, James's conclusions based on these particular spatters were "based upon insufficient facts and data, and accordingly, could not have been the product of reliable principles and methods applied reliably to the facts of this case," *id.* at 558. By contrast, the dissenting judge would have held that defendants waived their challenge to James's testimony regarding the untested blood spatters by "fail[ing] to object to the testimony when it was elicited by the State at trial." *Id.* at 609 (Collins, J., concurring in part and dissenting in part).

¶ 53        The dissenting judge did not address the majority's conclusions that (1) admission of the disputed testimony was erroneous and (2) the trial court's erroneous admission of this testimony prejudiced defendants. *Corbett*, 269 N.C. App. at 609 ("As Defendants did not object when the State elicited the testimony before the jury, Defendants failed to preserve the alleged error for appellate review."). Nor did the State seek discretionary review of these issues. Accordingly, we must restrict our review of the decision below to the sole issue that divided the majority and the

dissent, whether or not defendants preserved their challenge to James's testimony. *See State v. Rankin*, 371 N.C. 885, 895 (2018) (when a case "is before this Court based on a dissent in the Court of Appeals . . . the scope of review is limited to those questions on which there was division in the intermediate appellate court, and this Court's review is properly limited to the single issue addressed in the [Court of Appeals] dissent" (cleaned up) (alteration in original)).

¶ 54    "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion." N.C. R. App. P. 10(a)(1). "To be timely, an objection to the admission of evidence must be made at the time it is actually introduced at trial." *State v. Ray*, 364 N.C. 272, 277 (2010) (cleaned up). It is correct that although defendants objected to the introduction of the portion of James's expert report addressing the untested blood spatters, defendants failed to again object[11] when James testified at trial that

> [w]ith respect to *the small spatters on the front underside of the left leg of the* [*boxer*] *shorts*, these were consistent with the wearer of the shorts close to and above the source of the spattered blood. To what extent, I can't really say. In order for the stains to get to that location on the inside of the leg, they would have to be traveling, you know, at least

_____

[11] There is no indication in the record that defendants' counsel ever requested a continuing objection to the testimony at issue, which is one way that a party may preserve an objection for appellate review. *See, e.g., State v. Crawford*, 344 N.C. 65, 76 (1996) ("Defense counsel then asked the trial court to permit a 'continuing objection to any of the testimony here offered.' The trial court granted defendant's continuing objection to all of the victim's hearsay statements." (citing N.C.G.S. § 15A-1446(d)(10) (1993); *Duke Power Co. v. Winebarger*, 300 N.C. 57 (1980) (authorizing the use of a continuing objection to a line of questions on the same subject to preserve the objection)).

> somewhat upward in order to do that. My conclusion there
> was the source of the impact spatters is most likely the
> head of Jason Corbett while it was close to the floor in the
> bedroom.

However, we agree with the Court of Appeals that defendants did not waive their objection to the admissibility of James's testimony regarding these blood spatters. The record establishes that "[d]efendants did, in fact, timely object, and did so on multiple occasions before the jury throughout James's testimony." *Corbett*, 269 N.C. App. at 551. They "immediately objected when the State proffered James's 'Supplementary Report of Bloodstain Pattern Analysis' containing his comments and conclusions concerning, *inter alia*, Tom's boxer shorts and Molly's pajamas, which were the subject of Defendants' objections during voir dire." *Id.* The defendants then renewed their objections prior to James's second day of direct examination. *Id.* Thus, we are persuaded that "[d]efendants properly objected and preserved this issue for appeal." *Id.*

¶ 55      Regardless, we would also hold that defendants' objection to the admissibility of this evidence was preserved by operation of law. "In N.C.G.S. § 15A-1446(d) (2017), the General Assembly enumerated a list of issues it deems appealable without preservation in the trial court." *State v. Meadows*, 371 N.C. 742, 747–48 (2018). Pursuant to N.C.G.S. § 15A-1446(d)(10), notwithstanding a party's failure to object to the admission of evidence at some point at trial, a party may challenge "[s]ubsequent admission of evidence involving a specified line of questioning when

there has been an improperly overruled objection to the admission of evidence involving that line of questioning." N.C.G.S. § 15A-1446(d)(10) (2019).[12] Defendants objected to testimony based on the purported blood spatters on Tom's boxer shorts and Molly's pajama pants on numerous occasions. Because the dissenting judge did not dispute the majority's conclusion that the blood spatter evidence was erroneously admitted into evidence and because the State did not seek discretionary review of this issue which was not set forth in the opinion of the dissenting judge, the law of the case is that the trial court improperly overruled defendants' objection to this portion of the blood spatter testimony. *See Lanning v. Fieldcrest-Cannon, Inc.*, 352 N.C. 98, 105 (2000) (when "defendant did not seek, and this Court did not grant, discretionary review of . . . two issues . . . those issues are not before this Court; and the determination of the Court of Appeals becomes the law of the case as to those issues"). Accordingly, we affirm the Court of Appeals' holding that the objection was preserved at trial and further by operation of N.C.G.S. § 15A-1446(d)(10), the only

---

[12] In prior cases, we have held some subsections of N.C.G.S. § 15A-1446(d) unconstitutional as violating this Court's exclusive rulemaking authority. *See State v. Meadows*, 371 N.C. 742, 748 n.2 (2018) (describing cases holding N.C.G.S. § 15A-1446(d)(5), (6), and (13) unconstitutional). However, we have never held N.C.G.S. § 15A-1446(d)(10) unconstitutional. Because the provision does not "conflict[ ] with specific provisions of our appellate rules rather than the general rule stated in Rule of Appellate Procedure 10(a)," it "operates as a 'rule or law' under Rule 10(a)(1), which permits review of this issue." *State v. Mumford*, 364 N.C. 394, 403 (2010)

issue that is properly before this Court.[13]

### 4. *Tom's Testimony Regarding Molly's Statement "Don't Hurt My Dad"*

¶ 56    At trial, Tom testified that after he had been shoved to the ground in the midst of the altercation with Jason, he heard Molly yell "[d]on't hurt my dad." The State objected to this testimony. The trial court sustained the objection, told the jury to disregard it, and struck this portion of Tom's testimony from the record. On appeal, the majority below concluded that "[t]he trial court erroneously sustained the State's objection to Tom's testimony because Molly's out-of-court statement was either non-hearsay, or alternatively, admissible hearsay." *Corbett*, 269 N.C. App. at 560. We agree with the Court of Appeals that Molly's statement was admissible because it was relevant non-hearsay.

¶ 57    As explained above, an out-of-court statement introduced to prove the truth of the matter asserted is only admissible if it falls within an enumerated hearsay exception. However, "[a]s has been stated by this Court on numerous occasions . . . , whenever an extrajudicial statement is offered for a purpose other than proving the truth of the matter asserted, it is not hearsay." *State v. Maynard*, 311 N.C. 1, 15 (1984); *see also State v. Kirkman*, 293 N.C. 447, 455 (1977) ("The Hearsay Rule does

---

[13] The dissent claims that our consideration of N.C.G.S. § 15A-1446(d)(10) is inappropriate because the parties did not directly argue that their objection to the bloodstain analysis was preserved by operation of the statute. To the extent that the briefing before this Court is deficient on this point, it is possibly because the State failed to argue that defendants had not preserved their objection to the bloodstain analysis at the Court of Appeals.

not preclude a witness from testifying as to a statement made by another person when the purpose of the evidence is not to show the truth of such statement . . . .”). Read in context, it is clear that Tom testified about Molly's statement not to prove that Jason was actually about to harm him but to support his contention that he was, at that moment, subjectively fearful for his and his daughter's lives. His perception of Molly's statement was relevant regardless of the statement's actual "truth or falsity." *Valentine*, 357 N.C. at 524.[14] It was relevant because Tom testified that he heard Molly speak it, which tended to support his claim that he "reasonably believe[d]" that his use of deadly force was "necessary to defend himself . . . or another against [another's] imminent use of unlawful force" which he reasonably believed would have resulted in "imminent death or great bodily harm to himself . . . or another." N.C.G.S. § 14-51.3(a) (2019).

¶ 58    Tom's testimony bolstered his claim that he was subjectively fearful and that his fear was reasonable, based in part upon his hearing of Molly's statement. Thus,

---

[14] In fact, Tom's testimony was relevant regardless of whether or not Molly actually made this statement or any statement. What matters for the purpose of assessing Tom's subjective mental state is what Tom thought he heard. It would not matter if Molly had actually said "[d]on't look so sad." If what Tom heard in that moment was that he was about to be hurt, it is relevant to whether he "believed it was necessary to kill the deceased in order to save [him]self from death or great bodily harm, and if defendant's belief was reasonable in that *the circumstances as they appeared to* [*Tom*] *at the time* were sufficient to create such a belief in the mind of a person of ordinary firmness." *State v. Norris*, 303 N.C. 526, 530 (1981) (emphasis added). Thus, neither what Molly said nor whether she actually said anything matters for the purpose of this testimony. Rather, Tom is entitled to testify to his subjective belief at the time and what circumstances led him to have that belief.

his testimony was admissible for the appropriate non-hearsay purpose of "establish[ing] the state of mind of another person hearing the statement" or to "show the presence . . . of an emotion which would naturally result from hearing the statement." *State v. Grier*, 51 N.C. App. 209, 214 (1981). While this portion of Tom's testimony may have been self-serving, it was for the jury to decide "[t]he weight . . . to give the[ ] statement[ ] in deciding the issue of defendant's guilt or innocence depend[ing] upon" their assessment of Tom's credibility. *Valentine*, 357 N.C. at 524–25. Accordingly, we affirm the Court of Appeals' holding that the trial court erred by sustaining the State's objection to this portion of Tom's testimony.[15]

## III.   Prejudice

Having concluded that the trial court erred by excluding Jack's and Sarah's statements, by striking a portion of Tom's testimony, and by admitting certain expert witness testimony concerning alleged blood spatters on Tom's and Molly's clothing, we must determine whether defendants were prejudiced thereby. "To establish prejudice based on evidentiary rulings, defendant bears the burden of showing that a reasonable possibility exists that, absent the error, a different result would have been reached." *State v. Lynch*, 340 N.C. 435, 458 (1995); *see also* N.C.G.S. § 15A-1443

---

[15] In the alternative, we agree with defendants that the statement, if hearsay, fell within the "excited utterance" exception to the hearsay rule, which provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is admissible. N.C.G.S. § 8C-1, Rule 803(2) (2019).

(2019). An evidentiary error may be prejudicial on its own, but "should this Court conclude that no single error identified [at trial] was prejudicial, the cumulative effect of the errors nevertheless [may be] sufficiently prejudicial to require a new trial." *State v. Wilkerson*, 363 N.C. 382, 426 (2009). A new trial is warranted if the errors, either individually or "taken as a whole, deprived defendant of his due process right to a fair trial free from prejudicial error." *State v. Canady*, 355 N.C. 242, 254 (2002). Thus, even if we conclude that one evidentiary error, standing alone, is not itself prejudicial, we are still required to consider whether that error contributed to prejudice in the aggregate.

¶ 60    Here, the trial court's erroneous exclusion of Jack's and Sarah's testimony meaningfully deprived defendants of the opportunity to support their self-defense claim in several ways. This error was prejudicial for three reasons.

¶ 61    First, Jack's statement explaining the presence of the brick paver would have provided a non-culpable justification for why one of the defendants possessed one of the alleged murder weapons. We agree with the majority below that the State "benefited from the unexplained presence of one of two potential murder weapons in the master bedroom, and in fact, raised this very question during its opening statement." *Corbett*, 269 N.C. App. at 577 (emphasis omitted). Absent explanation, Molly's possession of the alleged murder weapon at the scene of the killing—a place where her possession of the murder weapon would otherwise have been highly

unusual—naturally gave rise to the inference that Molly did not act in self-defense.

¶ 62        Second, Sarah's statement describing her nightmare and her entry into the master bedroom provided compelling firsthand evidence supporting defendants' account of how the altercation began. Her statement confirmed that the altercation had a precipitating cause besides the actions of either defendant and that Jason was angry when the altercation began.

¶ 63        Third, we agree with the Court of Appeals that Jack's and Sarah's statements regarding Jason's worsening anger and their characterization of Jason and Molly's relationship "would have corroborated and provided significant context for the written statement that Molly provided at the Davidson County Sheriff's Office on 2 August 2015." *Corbett*, 269 N.C. App. at 578. The jury would have been presented with evidence which filled crucial gaps in Molly's statement, most notably why she had a brick paver within arm's reach in her bedroom and why she felt the need to use it under the circumstances as she perceived them.

¶ 64        Without evidence supporting their account of the circumstances leading up to the tragic events of 2 August 2015, it was easier for the jury to conclude that Tom and Molly had invented their story in an effort to cover up their crime and falsely assert that they acted in self-defense. There is a reasonable possibility that the outcome would have been different if the jury had been presented with admissible evidence providing a non-culpable justification for Molly's possession of a possible

murder weapon, the brick paver; offering a corroborative description of why the altercation began, because Jason was angry at being awoken by Sarah, which placed Molly in the position of a victim from the outset and evidence of important relevant information about the nature of Jason and Molly's relationship in the weeks and months leading up to this incident. Indeed, as the Court of Appeals recounted, the jury foreman explained that "how and why the paver made it into the home was the #1 question that was talked about when deliberations started.' " *Corbett*, 269 N.C. App. at 578 (cleaned up) (emphasis omitted). Further, Jack's and Sarah's testimony also would have corroborated Jason's medical records, which contained his admission that he had been feeling "more stressed and angry lately for no reason." This corroborative evidence would have provided important context to the jury as it considered how the altercation began, what state of mind Molly possessed during the altercation, and whether that state of mind is reasonable. A different outcome might reasonably have occurred at trial had the jury been provided with evidence tending to show that Jason was frequently angry and experiencing increased anger over recent months and that Jason and Molly had been awakened that night in a manner known previously to have caused discord in their relationship.

¶ 65        On the other hand, the trial court's erroneous exclusion of Tom's testimony regarding his perception of Molly's statement "[d]on't hurt my dad" was not by itself sufficiently prejudicial to either Tom or Molly as to warrant a new trial. This

testimony undoubtedly supported defendants' self-defense claim, in that it tended to corroborate Tom's testimony that he was subjectively fearful during the altercation and that his fear was reasonable. However, in this case, the prejudicial impact of excluding Tom's testimony was limited because this testimony was largely duplicative of other testimony that was admitted into evidence tending to establish his state of mind. Apart from the stricken testimony, Tom was permitted to testify at length and in significant detail about the circumstances of the altercation. Just before the stricken testimony, he stated "if I can get any more afraid, that was it. I can't see [Jason]. It's dark in the bedroom. I'm thinking the next thing is going to be a bat in the back of the head." He also testified that around the time he heard Molly yell, Jason shoved him to the ground, he lost his glasses, and he saw Molly trapped between Jason and the wall with Jason appearing poised to strike Molly with the baseball bat. This testimony amply supported Tom's claim that he was fearful and that his fear was reasonable. Although we cannot say the trial court's exclusion of his testimony had no effect on the jury's deliberations, this error standing alone was not significant enough to establish prejudice sufficient to warrant a new trial. However, we still consider this error in combination with other evidentiary errors that occurred during the trial to determine if the errors, in the aggregate, were prejudicial.

¶ 66         In that regard, it is significant that the trial court's errors in excluding evidence offered by defendants limited defendants in their ability to counter the

State's contention that they did not act in self-defense. In order to convict a defendant of second-degree murder in the presence of evidence of heat of passion or self-defense, "the [S]tate must prove beyond a reasonable doubt that defendant did not act in heat of passion and in self-defense in order to prove the existence of malice and unlawfulness, respectively." *State v. Marley*, 321 N.C. 415, 420 (1988). Evidence which tended to show that defendants both subjectively feared imminent death or substantial bodily harm and that their fear was reasonable at the time they used deadly force was extremely salient to the resolution of this question. *See, e.g.*, *State v. Williams*, 342 N.C. 869, 872–73 (1996) (describing the subjective and objective components of the defense of perfect self-defense). In addition, as the Court of Appeals explained, the erroneous admission of the blood-spatter testimony also undercut defendants' self-defense argument by "bolstering the State's claim that Jason was struck after and while he was down and defenseless." *Corbett*, 269 N.C. App. at 559.[16] In the present case, these errors together imposed a significant constraint on defendants' efforts to establish a crucial fact: namely, their state of mind at the time of the events in question based on all of the circumstances known to them.

We have long held that when a defendant has claimed self-defense, "a jury

---

[16] Additionally, because the only issue before us on the issue of the expert's bloodstain testimony was whether the objection was properly preserved, and by statute we necessarily must conclude that it was, the Court of Appeals ruling that the testimony was improperly admitted and prejudicial stands as an alternative ground requiring a new trial.

should, as far as is possible, be placed in defendant's situation and possess the same knowledge of danger and the same necessity for action, in order to decide if defendant acted under reasonable apprehension of danger to his person or his life." *State v. Johnson*, 270 N.C. 215, 219 (1967). In this case, "[i]f defendant[s] had been able to present the excluded testimony, [they] might have been able to convince the jury that [they used deadly force] while under a reasonable belief that it was necessary to do so in order to save [themselves] from death or great bodily harm." *State v. Webster*, 324 N.C. 385, 393 (1989). "Thus, there is a reasonable possibility that, had the error not been committed, a different result would have been reached at trial." *Id.* Accordingly, we affirm the decision of the Court of Appeals concluding that the trial court committed prejudicial evidentiary errors.

## IV. Conclusion

The events of 2 August 2015 which led to Jason Corbett's untimely death were tragic. Our system of laws assigns to the jury in this case the onerous responsibility of examining the evidence and determining if Tom Martens and Molly Corbett were guilty of second-degree murder or if the homicide was justified self-defense necessary to save them from serious bodily harm or death. However, it is the responsibility of the courts, including this Court, to ensure that both the State and criminal defendants are afforded the opportunity to fully and fairly present their cases. Here, Tom's and Molly's sole defense to the charges levelled against them was that their

use of deadly force was legally justified. By erroneously excluding admissible testimony which was relevant to the central question presented to the jury, the trial court impermissibly constrained defendants' ability to mount their defense. On these facts, we conclude that "[a]s a matter of fundamental fairness, the exclusion of [Jack's and Sarah's] statement[s] deprived the jury of evidence that was relevant and material to its role as finder of fact." *Sargeant*, 365 N.C. at 68. Similarly, the jury was erroneously instructed to disregard testimony supporting the conclusion that Tom was fearful of being seriously injured or killed. Therefore, we agree with the majority below that "this is the rare case in which certain evidentiary errors, alone and in the aggregate, were so prejudicial as to inhibit Defendants' ability to present a full and meaningful defense." *Corbett*, 269 N.C. App. at 512. Accordingly, we affirm.

AFFIRMED.

Justice BERGER dissenting.

The analysis by the majority contains three fundamental flaws. Concerning preservation, the majority creates an argument for defendants. In addition, throughout the opinion, the majority reweighs the evidence. Finally, and perhaps most remarkably, the majority engages in a de novo analysis of issues which should be reviewed for an abuse of discretion. Because defendants "receive[d] 'a fair trial, free of prejudicial error,' " *State v. Malachi*, 371 N.C. 719, 733, 821 S.E.2d 407, 418 (2018) (quoting *State v. Ligon*, 332 N.C. 224, 243, 420 S.E.2d 136, 147 (1992)), the trial court's judgments should be affirmed. Therefore, I respectfully dissent.

## I.    Preservation

Rules concerning preservation not only establish a framework for appellate review but also provide parties and trial courts with the opportunity to clarify arguments, frame issues, and correct errors at trial. As a matter of judicial economy, the trial court can ask for additional arguments from the parties, sustain objections, and give necessary curative instructions during trial, allowing for a better understanding of the arguments and issues presented in the case. *See State v. Oliver,* 309 N.C. 326, 334, 307 S.E.2d 304, 311 (1983) ("Rule 10 functions as an important vehicle to insure that errors are not 'built into' the record, thereby causing unnecessary appellate review."). This allows trial courts to correct errors on the front end, rather than engaging in needless after-the-fact appeals. *See generally State v.*

*Bursell*, 372 N.C. 196, 199, 827 S.E.2d 302, 305 (2019) ("[Rule 10] prevents unnecessary retrials by calling possible error to the attention of the trial court so that the presiding judge may take corrective action if it is required.").

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion . . . ." N.C. R. App. P. Rule 10(a)(1). "To be timely, an objection to the admission of evidence must be made 'at the time it is actually introduced at trial.'" *State v. Ray*, 364 N.C. 272, 277, 697 S.E.2d 319, 322 (2010) (quoting *State v. Thibodeaux*, 352 N.C. 570, 581, 532 S.E.2d 797, 806 (2000)). "[T]he Rules of Appellate Procedure must be consistently applied; otherwise, the Rules become meaningless, and an appellee is left without notice of the basis upon which an appellate court might rule." *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005).

Defendants' argument regarding the evidence of the blood stain on defendant Martens's boxer shorts was not preserved. The parties did not argue in their briefs or at oral argument that N.C.G.S. § 15A-1446(d)(10) was the vehicle through which this issue was preserved. Moreover, neither the Court of Appeals majority, nor the dissent, referenced this statute. However, the majority finds preservation by operation of N.C.G.S. § 15A-1446(d)(10).

It is troubling that the majority impermissibly creates an argument for defendants given the lack of briefing and argument by the parties. It is particularly

troubling that the majority does so utilizing a statute that this Court has, in part, declared unconstitutional where it conflicts with our appellate rules. *See State v. Mumford*, 364 N.C. 394, 403, 699 S.E.2d 911, 917 (2010) (stating that provisions of subsection 15A–1446(d) have been declared unconstitutional where those provisions "conflicted with specific provisions of our appellate rules rather than the general rule stated in Rule of Appellate Procedure 10(a)").

¶ 74     During voir dire, defendants objected to the reliability of the conclusion of the State's blood spatter expert, Stuart James, that the stains on defendant Martens's boxer shorts were impact blood spatter arising from blunt force strikes to Jason's head while he was on the ground. The trial court overruled defendants' objections.

¶ 75     At trial, Stuart James testified without objection as follows:

> With respect to the small spatters on the front underside of the left leg of the shorts, these were consistent with the wearer of the shorts close to and above the source of the spattered blood. To what extent, I can't really say. In order for the stains to get to that location on the inside of the leg, they would have to be traveling, you know, at least somewhat upward in order to do that. My conclusion there was the source of the impact spatters is most likely the head of Jason Corbett while it was close to the floor in the bedroom.

¶ 76     Defendants failed to renew their objections to this testimony at trial, and the majority acknowledges that "[t]here is no indication in the record that defendants' counsel ever requested a continuing objection to the testimony at issue . . . ." As defendants did not object when the State elicited the testimony before the jury,

defendants failed to preserve the alleged error for appellate review. *See State v. Snead*, 368 N.C. 811, 816, 783 S.E.2d 733, 737 (2016) ("An objection made 'only during a hearing out of the jury's presence prior to the actual introduction of the testimony' is insufficient." (quoting *Ray*, 364 N.C. at 277, 697 S.E.2d at 322)).

¶ 77        In relying on N.C.G.S. § 15A-1446(d)(10), the majority impermissibly creates an avenue for preservation that was not addressed, briefed, or argued. The majority's argument is a departure from our Rule 10 jurisprudence, and rests on questionable constitutional grounds.

¶ 78        Moreover, defendants were not prejudiced by the admission of testimony concerning one drop of untested blood due to the extensive amount of blood and blood spatter evidence that was admitted without objection. The State introduced without objection additional blood spatter evidence that Jason was struck when his head was close to the ground. Regarding the blood stains on the walls, Stuart James testified without objection that "the[ ] patterns are consistent with impacts to the head of [Jason] as he was descending to the floor[,]" that some of the impacts were "24 to 28 inches above the floor . . . [i]t went from five feet down to 24 to 28 inches[,]" and that the other impacts were "[a]pproximately 5 to 16 inches [from the floor] . . . [s]o that's what I meant by descending succession of impacts." Stuart James further testified that there were "impact spatters on the underside of the folded-back quilt" on the bottom of the bed in the master bedroom.

¶ 79        Additionally, defendant Martens testified, "[a]nd so I hit [Jason]. And I hit him until he goes down. And then I step away. . . . I hit him until I thought that he could not kill me."  To this point, Stuart James's testimony corroborates defendant Martens's testimony when he stated, "[a]nd if you would take those [untested stains] away, it really doesn't change much of my opinion.  It is still impact spatter with the wearer of the shorts in proximity with the source of the blood."

¶ 80        Defendants' failure to object may have been a trial strategy.  Defendants may not have wanted to draw additional attention to the overwhelming amount of blood and blood-related evidence associated with Jason's brutal death.  Whatever their reason, given the admission of other blood evidence showing that Jason was struck while close to or near the ground, defendants certainly were not prejudiced by the admission of the blood spatter testimony relating to defendant Martens's boxer shorts.

## II.        Hearsay Statements

¶ 81        This Court has recognized that, "[t]he competency, admissibility, and sufficiency of the evidence is a matter for the [trial] court to determine."  *In re Lucks*, 369 N.C. 222, 228, 794 S.E.2d 501, 506 (2016) (second alteration in original) (quoting *Queen City Coach Co. v. Lee*, 218 N.C. 320, 323, 11 S.E.2d 341, 343 (1940)).  Because our case law regarding the standard of review applicable to a ruling on whether evidence is admissible under Rule 803(4) is nonexistent, we can look to the federal

rules for guidance. *See State v. Wilson*, 322 N.C. 117, 132, 367 S.E.2d 589, 598 (1988) ("Since the case law concerning collateral statements under this rule of evidence in this State is negligible, we shall look to the federal courts for guidance on this point in interpreting its federal counterpart.").[1] Rule 803(4) of the North Carolina Rules of Evidence is similar to its federal counterpart. *Compare* N.C.G.S. § 8C-1, Rule 803(4) (2019), *with* Fed. R. Evid. 803(4). *See Roberts v. Hollocher*, 664 F.2d 200, 204 (8th

---

[1] Federal courts also recognize that evidentiary rules and those regarding hearsay are typically reviewed for abuse of discretion. *See, e.g., United States v. Earth*, 984 F.3d 1289, 1294 (8th Cir. 2021) ("We review a district court's rulings regarding the admission of hearsay evidence for an abuse of discretion."); *United States v. Lovato*, 950 F.3d 1337, 1341 (10th Cir. 2020) ("We review the district court's evidentiary rulings for an abuse of discretion, considering the record as a whole. Because hearsay determinations are particularly fact and case specific, we afford heightened deference to the district court when evaluating hearsay objections."(citations omitted)); *United States v. Slatten*, 865 F.3d 767, 805 (D.C. Cir. 2017) ("Ordinarily, the Court reviews the exclusion of a hearsay statement under the abuse of discretion standard."); *United States v. Ferrell*, 816 F.3d 433, 438 (7th Cir. 2015) ("To reverse a district court's decision on the admissibility of hearsay statements, we must conclude that the district court abused its discretion."); *United States v. Amador-Huggins*, 799 F.3d 124, 132 (1st Cir. 2015) ("The parties agree that our review of how the district court applied the hearsay rules to these facts is for abuse of discretion."); *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011) ("We review a trial court's rulings on the admissibility of evidence for abuse of discretion, and we will only overturn an evidentiary ruling that is 'arbitrary and irrational.' "); *United States v. Santos*, 589 F.3d 759, 763 (5th Cir. 2009) ("We review evidentiary rulings for abuse of discretion."); *United States v. Price*, 458 F.3d 202, 205 (3d Cir. 2006) ("Whether a statement is hearsay is a legal question subject to plenary review. If the district court correctly classifies a statement as hearsay, its application of the relevant hearsay exceptions is subject to review for abuse of discretion." (citations omitted)); *United States v. Brown*, 441 F.3d 1330, 1359 (11th Cir. 2006) ("We review a district court's hearsay ruling for abuse of discretion."); *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) ("All evidentiary rulings, including hearsay, are reviewed for abuse of discretion."); *United States v. Shryock*, 342 F.3d 948, 981 (9th Cir. 2003) ("We review for an abuse of discretion the district court's evidentiary rulings during trial, including the exclusion of evidence under the hearsay rule."); *United States v. Forrester*, 60 F.3d 52, 59 (2d Cir. 1995) ("[A]n application of the rules concerning hearsay is reviewed for the abuse of discretion.").

Cir. 1981) (Federal Rule of Evidence 803(4) excepts from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment").

The majority relies on *State v. Norman*, 196 N.C. App. 779, 783, 675 S.E.2d 395, 399 (2009), for the proposition that a ruling on whether evidence is admissible under Rule 803(4) is reviewed de novo. However, *Norman* is not binding precedent on this Court. *See N. Nat'l Life Ins. Co. v. Lacy J. Miller Mach. Co.*, 311 N.C. 62, 76, 316 S.E.2d 256, 265 (1984) ("This Court is not bound by precedents established by the Court of Appeals."). The *Norman* decision rests on a questionable interpretation of the standard of review utilized by this Court in *Hinnant*. A review of *Hinnant* shows that this Court did not state the standard it used to review the Rule 803(4) issues before it. Because this Court has never expressly established a standard of review under Rule 803(4), the plethora of federal hearsay jurisprudence is more persuasive than a single statement in *Norman*.[2] Accordingly, review of the admissibility of evidence under Rule 803(4) should be for an abuse of discretion.

---

[2] The majority further cites to *State v. Jones*, 339 N.C. 114, 146 (1994) and *State v. Stafford*, 317 N.C. 568, 571 (1986) for the proposition that this Court routinely reviews Rule 803(4) determinations de novo. This Court has never expressly stated the standard of review used to analyze Rule 803(4) issues. The majority acknowledges that this Court has never

¶ 83    Rule 803(4) excepts from the general rule against hearsay

> [s]tatements made for purposes of medical diagnosis or
> treatment and describing medical history, or past or
> present symptoms, pain, or sensations, or the inception or
> general character of the cause or external source thereof
> insofar as reasonably pertinent to diagnosis or treatment.

N.C.G.S. § 8C-1, Rule 803(4).  "This exception to the hearsay doctrine was created

because of a 'patient's strong motivation to be truthful' when making statements for

the purposes of medical diagnosis or treatment."  *State v. Lewis*, 172 N.C. App. 97,

103, 616 S.E.2d 1, 4–5 (2005) (citing N.C.G.S. § 8C-1, Rule 803(4) official commentary

(2003)).

> Rule 803(4) requires a two-part inquiry: (1) whether the
> declarant's statements were made for purposes of medical
> diagnosis or treatment; and (2) whether the declarant's
> statements were reasonably pertinent to diagnosis or
> treatment.

*Hinnant*, 351 N.C. at 284, 523 S.E.2d at 667.  "[T]he proponent of Rule 803(4)

testimony must affirmatively establish that the declarant had the requisite intent by

demonstrating that the declarant made the statements understanding that they

would lead to medical diagnosis or treatment." *Id*. at 287, 523 S.E.2d at 669.  To

determine whether a child's statements are admissible under this exception, "the trial

court should consider all objective circumstances of record surrounding [the]

---

"explicitly elaborated at length" our standard of review under 803(4).  After review of the
cases cited by the majority, it cannot be said that "our opinions interpreting Rule 803(4)
establish that the Court has routinely reviewed these decisions de novo . . . ."

declarant's statements in determining whether he or she possessed the requisite intent under Rule 803(4)." *Id.* at 288, 523 S.E.2d at 670.

¶ 84        At trial, Brandi Reagan, executive director of the Dragonfly House, explained that when a child arrives at the Dragonfly House for an appointment, the child is met by a child advocate who "talks with th[e] nonoffending caregiver and the child about . . . people they are going to meet, every service they are going to receive[,] and what would happen at the end of the appointment." Heydy Day, the child advocate in this case, testified, "I start off talking to the child and the caregiver saying, 'you will be talking with one of my friends today,' whether that's our interviewer Kim or interviewer Brandi, you will be talking to that lady." She testified that she would tell the children, "Once you finish talking with Miss Kim or Miss Brandi and the doctor finishes talking with the caregiver, then the doctor will call you back to do a head to toe check-up of you." Additionally, Reagan testified that interviews at the Dragonfly House took place in bedrooms to create a "child-friendly" interview room, rather than in the medical examination room.

¶ 85        When asked if he knew why he was at the Dragonfly House, Jack responded that he was there because "people are trying" to take him away from his mom. When asked who told him that, he responded "[m]y mom." When Sarah was asked if she knew why she was at the Dragonfly House, she responded, "[b]ecause my dad died."

¶ 86        The trial court determined the statements at issue did not qualify as statements for the purposes of the medical diagnosis or treatment exception because the trial court found that the children thought the interview was about custody.  The trial court made appropriate findings of fact and weighed factors when it determined that the circumstances surrounding the interviews did not indicate that either child understood that the interviews were for the purpose of medical diagnosis or treatment.  The declarants stated that they were present at the Dragonfly House either because their dad died or because of some issue relating to custody.  The children did not respond with an answer focusing on their physical or emotional well-being.  Based on these statements, the trial court reasonably concluded that the statements were not made for the purpose of medical diagnosis or treatment.  *See Hinnant*, 351 N.C. at 284, 523 S.E.2d at 667–68.

¶ 87        It is important to acknowledge that the trial court could have admitted the children's statements into evidence.  While reasonable minds can differ on the admissibility of this evidence, we cannot say that the trial court abused its discretion.  "The purpose of standards of review is to focus reviewing courts upon their proper role when passing on the conduct of other decision-makers.  Standards of review are thus an elemental expression of judicial restraint, which, in their deferential varieties, safeguard the superior vantage points of those entrusted with primary decisional responsibility."  *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d

315, 320–21 (4th Cir. 2008). The majority's de novo review does away with the fundamental safeguards that are available to all litigants when the primary decisional responsibility of the trial court is respected and maintained. *See United States v. Charboneau*, 914 F.3d 906, 912 (4th Cir. 2019). Our inquiry should be limited to whether the trial court's decision to exclude the statements was "manifestly unsupported by reason." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). Based upon the record in this case, the trial court did not abuse its discretion when it excluded the children's statements under Rule 803(4).

¶ 88     Similarly, the trial court did not abuse its discretion when it determined that the children's statements did not meet the requirements of the residual hearsay exception.

¶ 89     The residual hearsay exception is disfavored and should be invoked "very rarely, and only in exceptional circumstances." *State v. Smith*, 315 N.C. 76, 91 n.4, 337 S.E.2d 833, 844 n.4 (1985) (citation omitted). A trial court's determination of whether to admit statements under Rule 803(24) is reviewed for an abuse of discretion. *Id.* at 97, 337 S.E.2d at 847. As stated above, "[a] trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason." *White*, 312 N.C. at 777, 324 S.E.2d at 833.

¶ 90     The trial court "must enter appropriate statements, rationale, or findings of fact and conclusions of law . . . in the record to support [its] discretionary decision[,]"

*Smith*, 315 N.C. at 97, 337 S.E.2d at 847, to allow "a reviewing court to determine

whether the trial court abused its discretion in making its ruling," *State v. Sargeant*,

365 N.C. 58, 65, 707 S.E.2d 192, 196 (2011). Moreover, "evidence proffered for

admission pursuant to . . . Rule 803(24) . . . must be carefully scrutinized by the trial

judge within the framework of the rule's requirements." *Smith*, 315 N.C. at 92, 337

S.E.2d at 844.

> Under either of the two residual exceptions to the hearsay
> rule, the trial court must determine the following: (1)
> whether proper notice has been given, (2) whether the
> hearsay is not specifically covered elsewhere, (3) whether
> the statement is trustworthy, (4) whether the statement is
> material, (5) whether the statement is more probative on
> the issue than any other evidence which the proponent can
> procure through reasonable efforts, and (6) whether the
> interests of justice will be best served by admission.

*State v. Valentine*, 357 N.C. 512, 518, 591 S.E.2d 846, 852 (2003) (citation omitted).

The sole issue here concerns whether the children's statements were trustworthy.

In determining whether a statement under Rule 803(24) is "trustworthy," this

Court has identified the following factors to consider:

> (1) assurance of personal knowledge of the declarant of the
> underlying event; (2) the declarant's motivation to speak
> the truth or otherwise; (3) whether the declarant ever
> recanted the testimony; and (4) the practical availability of
> the declarant at trial for meaningful cross-examination.

*Smith*, 315 N.C. at 93–94, 337 S.E.2d at 845 (citations omitted). "[I]f the trial judge

examines the circumstances and determines that the proffered testimony does not

meet the trustworthiness requirement, his inquiry must cease upon his entry into the

record of his findings and conclusions, and the testimony may not be admitted

pursuant to Rule 803(24)." *Id.* at 94, 337 S.E.2d at 845.

¶ 92      The trial court made the following relevant findings of fact relating to the

children's statements:

> 15.      The children's statements did not describe actual
> knowledge of the events surrounding the homicide of Jason
> Corbett. Jack identified the source of the information in his
> statements by saying "my mom told me" and "she
> (defendant Molly Corbett) told us." Sarah similarly
> described the source of her knowledge, saying the [sic] her
> grandmother "told [me] first and then her mother [told
> me]." When speaking of her "grandmother," Sarah was
> referring to the mother of defendant Molly Corbett and the
> wife of defendant Thomas Martens.
>
> . . . .
>
> 20.      The statements of the children which the defense
> proffers were not made out of the personal knowledge of
> the declarant children but are instead double hearsay[3]
> declarations of the defendant Molly Corbett and her
> mother.
>
> 21.      These same statements were not made at a time
> when the children were motivated to speak the truth but
> were      rather      motivated      to      affect      future      custody

---

[3] The majority does not address the issue of double hearsay. In addition, the majority gives no direction to the trial court on which statements are admissible and which are not. Furthermore, the majority does not address the trial court's discretion to exclude this evidence under Rule 403 regardless of its admissibility under Rule 803(24). *See* N.C.G.S. § 8C-1, Rule 403 (2019) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

arrangements—specifically the children feared that they were going to be "taken away from their mother" and removed to another country by their father's relatives.

22. The statements of the children that are offered by the defense as pertinent to the relationship between Molly Corbett and Jason Corbett have been specifically recanted. Sarah Corbett, the younger of the two children, recanted her statements in diary entries made after her return to Ireland. Jack Corbett recanted his statements in diary entries and during a recorded interview with members of the District Attorney's Office.

With regard to finding of fact 15, that the statements did not describe the homicide, there is no evidence that the children witnessed the homicide of Jason. Jack was asleep that night and did not wake up until law enforcement came into his room, and Sarah was documented saying that "at night she was sleeping and an officer came upstairs around 4 AM and took her downstairs to her grandma." Her mom told her that someone got hurt and later told her that her dad died.

As to finding of fact 20, that the statements were not made with personal knowledge, the Dragonfly House's Medical Services Log for Sarah states that "Sarah does not disclose witnessing [domestic violence]." When asked if Sarah saw Jason hurt Molly, Sarah said, "No, not really ever, but one time I saw him step on her foot." Reagan followed up by asking, "So when you said that he would fight with her and he would hurt her, you said you didn't really see it, how would you know about it?" Sarah responded, "Because, um, my mom told me." Further, the DSS social worker's notes

stated, "Sarah states her father screams and yells and states when her mom and dad goes into the room her dad hurts her mom. She stated her mom told her."

¶ 95        When Reagan asked Jack, "How did your dad die?" Jack responded:

> Okay. Well, my sister had a nightmare about insect crawling—she had fairy blankets and insects all over her bed. That was a nightmare, though. And my dad got very mad, and he was screaming at our mom, and my mom screamed, and my grandpa came up and started to hit him with a bat. And then my dad grabbed hold of the bat— grabbed—held the bat and hit my grandpa with the bat, until my mom put a—put—we were going to paint a brick that was in there, like a cinder block, and it hit his temple, right here, and he died.

When Reagan asked, "now you said your sister had a nightmare. How did you know that?" Jack responded, "My parents—my mom told me." When asked to recount details about Jason's behavior, Jack admitted he "[didn't] actually remember[,]" or stated that he knew because his mom or grandma told him. Lastly, Reagan asked, "[a]nd just to make sure I understand, how did you find out that your mom hit [your dad] with a brick and your grandpa hit him with a bat?" Jack responded, "She told me."

¶ 96        The record demonstrates that there was evidence to support the trial court's findings of fact 15 and 20 because the children's statements were not made with "actual knowledge of the events surrounding the homicide of Jason" and "were not made out of the personal knowledge of the declarant children." Moreover, finding of fact 21 was supported by Sarah's exchange at Dragonfly House. When Sarah was

asked, "Tell me why you're here today[,]" she responded, "Because my dad died." Sarah stated, "I actually heard people talk about my aunt trying to come get us, trying to come get me and my brother. Like, and she (indiscernible) right now and (indiscernible). And that's why at the funeral, I had to (indiscernible) my mother—my mom's hand the whole time." In addition, Jack stated, "my dad died, and people are trying—my aunt and uncle from my dad's side are trying to take away—take me away from my mom. And—that's why I'm here. My mom's trying to get custody over us."

¶ 97        Further, finding of fact 22, that the statements were recanted, is supported by Jack's Skype interview from Ireland and copies of diary entries written by Sarah and Jack. Jack recanted his earlier statements and stated, "I didn't tell the truth at Dragonfly. I didn't tell the truth [during the DSS Interview]." Sarah's diary entries include statements that defendant Corbett had instructed the children to say that Jason hit and yelled at defendant Corbett and that defendant Corbett told Sarah that Jason had killed Sarah's mom by putting a pillow over her mouth. This evidence supports the trial court's determination that the children's statements concerning the relationship between defendant Corbett and Jason had "been specifically recanted."

¶ 98        Given the findings of fact, the trial court's conclusion that "[t]he proffered statements do not have circumstantial guarantees of trustworthiness" was not an abuse of discretion. In addition, under Rule 104(a) the trial court was entitled to

consider the children's recantations in determining whether to admit the children's statements into evidence under the residual hearsay exception. *See* N.C.G.S. § 8C-1, Rule 104(a) (2019) ("Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court . . . ."). Further, the majority acknowledged the trial court's gatekeeping function stating, "the trial court was entitled to consider Jack's Skype interview and Sarah's diary entries, regardless of whether either would ultimately have been deemed admissible evidence, in making a preliminary determination regarding the admissibility of the Dragonfly House interview and DSS interviews." Here, the trial court entered "appropriate statements, rationale, or findings of fact and conclusions of law [ ] in the record to support his discretionary decision[.]" *Smith*, 315 N.C. at 97, 337 S.E.2d at 847.

¶ 99        There is support in the record for the trial court's determination that the statements "were not made at a time when the children were motivated to speak the truth but were rather motivated to affect future custody arrangements." Therefore, the trial court's determination that the children's statements were not admissible under the residual exception was not "manifestly unsupported by reason." *White*, 312 N.C. at 777, 324 S.E.2d at 833.

¶ 100        Even if we assume the trial court erred when it excluded the children's statements, defendants have not shown that they were prejudiced. It is

uncontroverted that defendants killed Jason. The question for the jury was whether defendants' killing of Jason was justified.

¶ 101        The autopsy report stated that Jason died of blunt force trauma to the head. Jason sustained "[e]xtensive skull fractures" from "multiple blunt force impact sites of the head." According to the medical examiner, Jason's injuries "included ten different areas of impact on the head, at least two of which had features suggesting repeated blows indicating a minimum of 12 different blows to the head." The medical examiner testified that an injury on the right side of Jason's head was caused by an object with a sharp edge not consistent with a baseball bat. In addition, Jason had a broken nose and blunt force injuries to his torso, left hand, and legs.

¶ 102        Defendant Martens testified that he first "hit [Jason] in the head, the back of the head with the baseball bat," but the blow did not stop Jason. Defendant Martens then "tried to hit [Jason] as many times as [he] could to distract [Jason]" in the hallway. According to defendant Martens, he had struck Jason at least two times in the back of the head with the aluminum baseball bat at this point in the altercation. After coming back down the hallway, Jason and defendant Martens struggled over the bat. Jason obtained control of the bat and pushed defendant Martens over the bed and onto the floor. Defendant Martens eventually regained control of the bat and struck Jason again. Defendant Martens then testified, "just because [Jason] lost control of the bat doesn't mean this is over. This was far from over. . . . And so I still

think that, you know, he has the advantage even though—'cause I know what I'm feeling like. I'm shaking. I'm not doing good now. And so I hit him. And I hit him until he goes down." Defendant Martens admitted that he beat Jason with the aluminum bat until he was no longer moving.

¶ 103        Defendant Martens gave a statement to authorities and testified that he had no knowledge of the brick paver or that the brick paver was used to kill Jason. However, the State's evidence showed that defendant Corbett provided a statement to detectives admitting that she struck Jason with the brick paver. The brick paver had hair fragments and blood stains which were consistent with multiple impacts to Jason's head. Based on defendant Martens's testimony and defendant Corbett's statement to law enforcement, defendant Corbett could not have struck Jason with the brick paver until after she broke away from his initial assault.

¶ 104        The jury heard this evidence, and defendants had the opportunity to argue this evidence and the issue of self-defense to the jury. Even assuming the children's statements were admissible, defendants have failed to show how these statements have any bearing on whether they were justified in killing Jason. While the children's statements highlight past incidents of alleged domestic abuse, the jury heard defendant Martens's testimony that Jason was abusing defendant Corbett that night in the bedroom. The jury was also able to consider defendant Corbett's statement to

law enforcement that Jason was choking her before defendant Martens hit Jason with the aluminum baseball bat.

¶ 105        At the same time, the jury heard evidence that Jason's body "felt cool" and there was "dry blood on him" indicating he had been there for some time before paramedics arrived. The jury also heard evidence that the blood spatter indicated that Jason was struck at or near the ground; that defendant Martens "hit [Jason] until he went down"; and that neither defendant had any visible injuries. Further, an aggressor instruction was given as to defendant Martens. The jury had the opportunity to compare defendants' statements, and the testimony of defendant Martens, with the physical evidence surrounding Jason's death. *See State v. Patterson*, 335 N.C. 437, 451, 439 S.E.2d 578, 586 (1994) (finding that despite the defendant's contention that he killed the victim accidentally, "[f]rom [the physical] evidence, the jury could reasonably infer that defendant intentionally pointed the shotgun at [the victim] at close range and intentionally pulled the trigger"). Any purported errors relating to the trial court's decision to exclude the children's statements as evidence did not deprive defendants of a fair hearing on the issue of self-defense.

¶ 106        Moreover, the children's statements and subsequent recantations were not relevant to defendant Martens's state of mind. *See State v. Smith*, 337 N.C. 658, 447 S.E.2d 376 (1994) (finding evidence of prior violence not admissible because there was

no evidence defendant had knowledge of prior violent behavior).  Defendant Martens testified that he was unaware of any acts of violence between Jason and defendant Corbett.

¶ 107        The evidence against defendants in this case was overwhelming.  Each defendant had the opportunity to argue and present their arguments of self-defense to the jury.  Neither defendant has established the possibility of a different result. *See* N.C.G.S. § 15A-1443(a) (2019) ("A defendant is prejudiced . . . when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached . . . .").  Therefore, the decision of the trial court should be affirmed.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.